## AMALGAMATED FOOD EMPLOYEES UNION LOCAL 590 ET AL. v. LOGAN VALLEY PLAZA, INC., ET AL.

No. 478.   Argued March 14, 1968.—Decided May 20, 1968.

*Bernard Dunau* argued the cause for petitioners. With him on the briefs was *Lester Asher.*

*Robert Lewis* argued the cause for respondents. With him on the brief was *Sidney Apfelbaum.*

Briefs of *amici curiae,* urging reversal, were filed by *Solicitor General Griswold, Arnold Ordman, Dominick L. Manoli,* and *Norton J. Come* for the National Labor Relations Board; by *J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations; by *S. G. Lippman* and *Tim Bornstein* for the Retail Clerks International Association, and by *Marvin M. Karpatkin* and *Melvin L. Wulf* for the American Civil Liberties Union.

Briefs of *amici curiae,* urging affirmance, were filed by *Fred H. Daugherty* for the International Council of Shopping Centers, Inc., and by *Charles J. Barnhill* for the American Retail Federation.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

This case presents the question whether peaceful picketing of a business enterprise located within a shopping center can be enjoined on the ground that it constitutes an unconsented invasion of the property rights of the owners of the land on which the center is situated. We granted certiorari to consider petitioners' contentions that the decisions of the state courts enjoining their picketing as a trespass are violative of their rights under the First and Fourteenth Amendments of the United States Constitution. 389 U. S. 911 (1967).[1] We reverse.

---

[1] Petitioners also contend (1) that the state courts were without jurisdiction in this case because the controversy involves issues that

Logan Valley Plaza, Inc. (Logan), one of the two respondents herein, owns a large, newly developed shopping center complex, known as the Logan Valley Mall, located near the City of Altoona, Pennsylvania. The shopping center is situated at the intersection of Plank Road, which is to the east of the center, and Good's Lane, which is to the south. Plank Road, also known as U. S. Route 220, is a heavily traveled highway along which traffic moves at a fairly high rate of speed. There are five entrance roads into the center, three from Plank Road and two from Good's Lane. Aside from these five entrances, the shopping center is totally separated from the adjoining roads by earthen berms. The berms are 15 feet wide along Good's Lane and 12 feet wide along Plank Road.

At the time of the events in this case, Logan Valley Mall was occupied by two businesses, Weis Markets, Inc. (Weis), the other respondent herein, and Sears, Roebuck and Co. (Sears), although other enterprises were then expected and have since moved into the center. Weis operates a supermarket and Sears operates both a department store and an automobile service center. The Weis property consists of the enclosed supermarket building, an open but covered porch along the front of the building, and an approximately five-foot-wide parcel pickup zone that runs 30 to 40 feet along the porch. The porch functions as a sidewalk in front of the building and the pickup zone is used as a temporary parking place for the loading of purchases into customers' cars by Weis employees.

are within the exclusive jurisdiction of the National Labor Relations Board, see *Meat Cutters Local 427* v. *Fairlawn Meats, Inc.*, 353 U. S. 20 (1957), and (2) that the picketing herein was protected as a "concerted activit[y] for . . . mutual aid or protection" by § 7 of the National Labor Relations Act, as amended, 49 Stat. 452, 29 U. S. C. § 157. Because of our disposition of the case, we do not reach either contention.

Between the Weis building and the highway berms are extensive macadam parking lots with parking spaces and driveways lined off thereon. These areas, to which Logan retains title, provide common parking facilities for all the businesses in the shopping center. The distance across the parking lots to the Weis store from the entrances on Good's Lane is approximately 350 feet and from the entrances on Plank Road approximately 400 to 500 feet. The entrance on Plank Road farthest from the Weis property is the main entrance to the shopping center as a whole and is regularly used by customers of Weis. The entrance on Plank Road nearest to Weis is almost exclusively used by patrons of the Sears automobile service station into which it leads directly.

On December 8, 1965, Weis opened for business, employing a wholly nonunion staff of employees. A few days after it opened for business, Weis posted a sign on the exterior of its building prohibiting trespassing or soliciting by anyone other than its employees on its porch or parking lot. On December 17, 1965, members of Amalgamated Food Employees Union, Local 590, began picketing Weis. They carried signs stating that the Weis market was nonunion and that its employees were not "receiving union wages or other union benefits." The pickets did not include any employees of Weis, but rather were all employees of competitors of Weis. The picketing continued until December 27, during which time the number of pickets varied between four and 13 and averaged around six. The picketing was carried out almost entirely in the parcel pickup area and that portion of the parking lot immediately adjacent thereto. Although some congestion of the parcel pickup area occurred, such congestion was sporadic and infrequent.[2]

---

[2] Such congestion as there may have been was regulated by portions of the order not here challenged. See n. 4, *infra.*

The picketing was peaceful at all times and unaccompanied by either threats or violence.

On December 27, Weis and Logan instituted an action in equity in the Court of Common Pleas of Blair County, and that court immediately issued an *ex parte* order enjoining petitioners [3] from, *inter alia,* "[p]icketing and trespassing upon . . . the [Weis] storeroom, porch and parcel pick-up area . . . [and] the [Logan] parking area and all entrances and exits leading to said parking area." [4] The effect of this order was to require that all picketing be carried on along the berms beside the public roads outside the shopping center. Picketing continued along the berms and, in addition, handbills asking the public not to patronize Weis because it was nonunion were distributed, while petitioners contested the validity of the *ex parte* injunction. After an evidentiary hearing, which resulted in the establishment of the facts set forth above, the Court of Common Pleas continued indefinitely its original *ex parte* injunction without modification. [5]

---

[3] In addition to Local 590, the petitioners herein are various members and officials of the local who were engaged in the picketing in one way or another.

[4] The court also enjoined petitioners from blocking access by anyone to respondents' premises, making any threats or using any violence against customers, employees, and suppliers of Weis, and physically interfering with the performance by Weis employees of their duties. Petitioners make no challenge to these parts of the order and it appears conceded that there has been no subsequent picketing by petitioners in violation of these provisions. A portion of the order also directs that no more than "—— pickets" be used at any one time, but no number has ever been inserted into the blank space and thus no limitation appears to have ever been imposed.

[5] We need not concern ourselves with deciding whether the injunction is to be characterized as permanent or temporary. Since the order provides in terms that it shall remain in effect until further modification by the court and since there is no indication that any modification affecting the issues presently before us will be forth-

That court explicitly rejected petitioners' claim under the First Amendment that they were entitled to picket within the confines of the shopping center, and their contention that the suit was within the primary jurisdiction of the NLRB. The trial judge held that the injunction was justified both in order to protect respondents' property rights and because the picketing was unlawfully aimed at coercing Weis to compel its employees to join a union. On appeal the Pennsylvania Supreme Court, with three Justices dissenting, affirmed the issuance of the injunction on the sole ground that petitioners' conduct constituted a trespass on respondents' property.[6]

We start from the premise that peaceful picketing carried on in a location open generally to the public is, absent other factors involving the purpose or manner of the picketing, protected by the First Amendment. *Thornhill* v. *Alabama*, 310 U. S. 88 (1940); *AFL* v. *Swing*, 312 U. S. 321 (1941); *Bakery Drivers Local 802* v. *Wohl*, 315 U. S. 769 (1942); *Teamsters Local 795* v. *Newell*, 356 U. S. 341 (1958). To be sure, this Court has noted that picketing involves elements of both speech and conduct, *i. e.*, patrolling, and has indicated that because of this intermingling of protected and unprotected elements, picketing can be subjected to controls that would not be constitutionally permissible in the case of pure speech. See, *e. g.*, *Hughes* v. *Superior Court*, 339 U. S. 460 (1950); *International Bro. of Teamsters* v. *Vogt, Inc.*, 354 U. S. 284 (1957); *Cox* v. *Louisiana*, 379 U. S. 559 (1965); *Cameron* v. *Johnson*, 390 U. S. 611.

coming at any time in the near future, the judgment below upholding the issuance of the injunction is clearly final for purposes of review by this Court. Compare *Construction Laborers' Local 438* v. *Curry*, 371 U. S. 542 (1963).

[6] Petitioners did not argue their pre-emption contentions in their brief before the Pennsylvania Supreme Court and, accordingly, that court does not appear to have passed on them.

Nevertheless, no case decided by this Court can be found to support the proposition that the nonspeech aspects of peaceful picketing are so great as to render the provisions of the First Amendment inapplicable to it altogether.

The majority of the cases from this Court relied on by respondents, in support of their contention that picketing can be subjected to a blanket prohibition in some instances by the States, involved picketing that was found either to have been directed at an illegal end, *e. g., Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490 (1949); *Building Service Employees Local 262* v. *Gazzam,* 339 U. S. 532 (1950); *Plumbers Local 10* v. *Graham,* 345 U. S. 192 (1953), or to have been directed at coercing a decision by an employer which, although in itself legal, could validly be required by the State to be left to the employer's free choice, *e. g., Carpenters Local 213* v. *Ritter's Cafe,* 315 U. S. 722 (1942) (secondary boycott); *Teamsters Local 309* v. *Hanke,* 339 U. S. 470 (1950) (self-employer union shop). Compare *NLRB* v. *Denver Bldg. & Const. Trades Council,* 341 U. S. 675 (1951), and *International Bro. of Electrical Workers* v. *NLRB,* 341 U. S. 694 (1951).

Those cases are not applicable here because they all turned on the purpose for which the picketing was carried on, not its location. In this case the Pennsylvania Supreme Court specifically disavowed reliance on the finding of unlawful purpose on which the trial court alternatively based its issuance of the injunction.[7] It did emphasize that the pickets were not employees of Weis and were discouraging the public from patroniz-

---

[7] Needless to say, had the Pennsylvania Supreme Court relied on the purpose of the picketing and held it to be illegal, substantial questions of pre-emption under the federal labor laws would have been presented. Compare *Hotel Employees Local 255* v. *Sax Enterprises, Inc.,* 358 U. S. 270 (1959).

ing the Weis market. However, those facts could in no way provide a constitutionally permissible independent basis for the decision because this Court has previously specifically held that picketing of a business enterprise cannot be prohibited on the *sole* ground that it is conducted by persons not employees whose purpose is to discourage patronage of the business. *AFL* v. *Swing*, 312 U. S. 321 (1941). Compare *Bakery Drivers Local 802* v. *Wohl*, 315 U. S. 769 (1942). Rather, those factors merely supported the court's finding of a trespass by demonstrating that the picketing took place without the consent, and against the will, of respondents.

The case squarely presents, therefore, the question whether Pennsylvania's generally valid rules against trespass to private property can be applied in these circumstances to bar petitioners from the Weis and Logan premises. It is clear that if the shopping center premises were not privately owned but instead constituted the business area of a municipality, which they to a large extent resemble, petitioners could not be barred from exercising their First Amendment rights there on the sole ground that title to the property was in the municipality. *Lovell* v. *Griffin*, 303 U. S. 444 (1938); *Hague* v. *CIO*, 307 U. S. 496 (1939); *Schneider* v. *State*, 308 U. S. 147 (1939); *Jamison* v. *Texas*, 318 U. S. 413 (1943). The essence of those opinions is that streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely.

The fact that *Lovell, Schneider,* and *Jamison* were concerned with handbilling rather than picketing is immaterial so far as the question is solely one of right of access for the purpose of expression of views. Handbilling, like picketing, involves conduct other than speech,

namely, the physical presence of the person distributing leaflets on municipal property. If title to municipal property is, standing alone, an insufficient basis for prohibiting all entry onto such property for the purpose of distributing printed matter, it is likewise an insufficient basis for prohibiting all entry for the purpose of carrying an informational placard. While the patrolling involved in picketing may in some cases constitute an interference with the use of public property greater than that produced by handbilling, it is clear that in other cases the converse may be true. Obviously, a few persons walking slowly back and forth holding placards can be less obstructive of, for example, a public sidewalk than numerous persons milling around handing out leaflets. That the manner in which handbilling, or picketing, is carried out may be regulated does not mean that either can be barred under all circumstances on publicly owned property simply by recourse to traditional concepts of property law concerning the incidents of ownership of real property.

This Court has also held, in *Marsh* v. *Alabama,* 326 U. S. 501 (1946), that under some circumstances property that is privately owned may, at least for First Amendment purposes, be treated as though it were publicly held. In *Marsh,* the appellant, a Jehovah's Witness, had undertaken to distribute religious literature on a sidewalk in the business district of Chickasaw, Alabama. Chickasaw, a so-called company town, was wholly owned by the Gulf Shipbuilding Corporation. "The property consists of residential buildings, streets, a system of sewers, a sewage disposal plant and a 'business block' on which business places are situated. . . . [T]he residents use the business block as their regular shopping center. To do so, they now, as they have for many years, make use of a company-owned paved street and sidewalk located alongside the store fronts in order to enter and

leave the stores and the post office. Intersecting company-owned roads at each end of the business block lead into a four-lane public highway which runs parallel to the business block at a distance of thirty feet. There is nothing to stop highway traffic from coming onto the business block and upon arrival a traveler may make free use of the facilities available there. In short the town and its shopping district are accessible to and freely used by the public in general and there is nothing to distinguish them from any other town and shopping center except the fact that the title to the property belongs to a private corporation." 326 U. S., at 502–503.

The corporation had posted notices in the stores stating that the premises were private property and that no solicitation of any kind without written permission would be permitted. Appellant Marsh was told that she must have a permit to distribute her literature and that a permit would not be granted to her. When she declared that the company rule could not be utilized to prevent her from exercising her constitutional rights under the First Amendment, she was ordered to leave Chickasaw. She refused to do so and was arrested for violating Alabama's criminal trespass statute. In reversing her conviction under the statute, this Court held that the fact that the property from which appellant was sought to be ejected for exercising her First Amendment rights was owned by a private corporation rather than the State was an insufficient basis to justify the infringement on appellant's right to free expression occasioned thereby. Likewise the fact that appellant Marsh was herself not a resident of the town was not considered material.

The similarities between the business block in *Marsh* and the shopping center in the present case are striking. The perimeter of Logan Valley Mall is a little less than 1.1 miles. Inside the mall were situated, at the time of trial, two substantial commercial enterprises with nu-

merous others soon to follow.[8]   Immediately adjacent to the mall are two roads, one of which is a heavily traveled state highway and from both of which lead entrances directly into the mall.   Adjoining the buildings in the middle of the mall are sidewalks for the use of pedestrians going to and from their cars and from building to building.   In the parking areas, roadways for the use of vehicular traffic entering and leaving the mall are clearly marked out.   The general public has unrestricted access to the mall property.   The shopping center here is clearly the functional equivalent of the business district of Chickasaw involved in *Marsh*.

It is true that, unlike the corporation in *Marsh,* the respondents here do not own the surrounding residential property and do not provide municipal services therefor. Presumably, petitioners are free to canvass the neighborhood with their message about the nonunion status of Weis Market, just as they have been permitted by the state courts to picket on the berms outside the mall. Thus, unlike the situation in *Marsh,* there is no power on respondents' part to have petitioners totally denied access to the community for which the mall serves as a business district.   This fact, however, is not determinative.   In *Marsh* itself the precise issue presented was whether the appellant therein had the right, under the First Amendment, to pass out leaflets in the business district, since there was no showing made there that the corporate owner would have sought to prevent the distribution of leaflets in the residential areas of the town. While it is probable that the power to prevent trespass broadly claimed in *Marsh* would have encompassed such an incursion into the residential areas, the specific facts in the case involved access to property used for commercial purposes.

---

[8] We are informed that, in addition to Weis and Sears, 15 other commercial establishments are presently situated in the shopping center.

We see no reason why access to a business district in a company town for the purpose of exercising First Amendment rights should be constitutionally required, while access for the same purpose to property functioning as a business district should be limited simply because the property surrounding the "business district" is not under the same ownership. Here the roadways provided for vehicular movement within the mall and the sidewalks leading from building to building are the functional equivalents of the streets and sidewalks of a normal municipal business district. The shopping center premises are open to the public to the same extent as the commercial center of a normal town. So far as can be determined, the main distinction in practice between use by the public of the Logan Valley Mall and of any other business district, were the decisions of the state courts to stand, would be that those members of the general public who sought to use the mall premises in a manner contrary to the wishes of the respondents could be prevented from so doing.

Such a power on the part of respondents would be, of course, part and parcel of the rights traditionally associated with ownership of private property. And it may well be that respondents' ownership of the property here in question gives them various rights, under the laws of Pennsylvania, to limit the use of that property by members of the public in a manner that would not be permissible were the property owned by a municipality. All we decide here is that because the shopping center serves as the community business block "and is freely accessible and open to the people in the area and those passing through," *Marsh* v. *Alabama,* 326 U. S., at 508, the State may not delegate the power, through the use of its trespass laws, wholly to exclude those members of the public wishing to exercise their First Amendment rights on the premises in a manner and for a purpose

generally consonant with the use to which the property is actually put.[9]

We do not hold that respondents, and at their behest the State, are without power to make reasonable regulations governing the exercise of First Amendment rights on their property. Certainly their rights to make such regulations are at the very least co-extensive with the powers possessed by States and municipalities, and recognized in many opinions of this Court, to control the use of public property. Thus where property is not ordinarily open to the public, this Court has held that access to it for the purpose of exercising First Amendment rights may be denied altogether. See *Adderley* v. *Florida,* 385 U. S. 39 (1966). Even where municipal or state property is open to the public generally, the exercise of First Amendment rights may be regulated so as to prevent interference with the use to which the property is ordinarily put by the State. Thus we have upheld a statute prohibiting picketing "in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any . . . county . . . courthouses." *Cameron* v. *Johnson,* 390 U. S. 611, 616. Likewise it has been indicated that persons could be constitutionally prohibited from picketing "in or near" a court "with the intent of interfering with, obstructing, or impeding the administration of justice." *Cox* v. *Louisiana,* 379 U. S. 559 (1965).

In addition, the exercise of First Amendment rights may be regulated where such exercise will unduly inter-

---

[9] The picketing carried on by petitioners was directed specifically at patrons of the Weis Market located within the shopping center and the message sought to be conveyed to the public concerned the manner in which that particular market was being operated. We are, therefore, not called upon to consider whether respondents' property rights could, consistently with the First Amendment, justify a bar on picketing which was not thus directly related in its purpose to the use to which the shopping center property was being put.

fere with the normal use of the public property by other members of the public with an equal right of access to it. Thus it has been held that persons desiring to parade along city streets may be required to secure a permit in order that municipal authorities be able to limit the amount of interference with use of the sidewalks by other members of the public by regulating the time, place, and manner of the parade. *Cox* v. *New Hampshire,* 312 U. S. 569 (1941); *Poulos* v. *New Hampshire,* 345 U. S. 395 (1953). Compare *Kovacs* v. *Cooper,* 336 U. S. 77 (1949) (use of sound trucks making "loud and raucous noises" on public streets may be prohibited).

However, none of these cases is applicable to the present case. Because the Pennsylvania courts have held that "picketing and trespassing" can be prohibited absolutely on respondents' premises, we have no occasion to consider the extent to which respondents are entitled to limit the location and manner of the picketing or the number of pickets within the mall in order to prevent interference with either access to the market building or vehicular use of the parcel pickup area and parking lot.[10] Likewise, *Adderley* furnishes no support for the decision below because it is clear that the public has virtually unrestricted access to the property at issue here. Respondents seek to defend the injunction they have obtained by characterizing the requirement that picketing be carried on outside the Logan Mall premises as a regulation rather than a suppression of it. Accepting *arguendo* such a characterization, the question remains, under the First Amendment, whether it is a permissible regulation.

Petitioners' picketing was directed solely at one establishment within the shopping center. The berms sur-

[10] Compare *Cox* v. *New Hampshire, supra; Cox* v. *Louisiana, supra; Cameron* v. *Johnson, supra.* It should be noted that portions of the injunction, not contested here by petitioners, do accomplish precisely such a regulation of the picketing. See n. 4, *supra.*

rounding the center are from 350 to 500 feet away from the Weis store. All entry onto the mall premises by customers of Weis, so far as appears, is by vehicle from the roads alongside which the berms run. Thus the placards bearing the message which petitioners seek to communicate to patrons of Weis must be read by those to whom they are directed either at a distance so great as to render them virtually indecipherable—where the Weis customers are already within the mall—or while the prospective reader is moving by car from the roads onto the mall parking areas via the entrance ways cut through the berms. In addition, the pickets are placed in some danger by being forced to walk along heavily traveled roads along which traffic moves constantly at rates of speed varying from moderate to high. Likewise, the task of distributing handbills to persons in moving automobiles is vastly greater (and more hazardous) than it would be were petitioners permitted to pass them out within the mall to pedestrians.[11] Finally, the require-

---

[11] Respondents argue that this case does not involve petitioners' right to distribute handbills, notwithstanding that the provision of the injunction prohibiting trespassing would seem to encompass entry for the purpose of distributing leaflets, because the petitioners were never engaged in handbilling within the mall. Similarly respondents suggest that the only question concerning picketing in this case relates to the picketing carried on in the parcel pickup area, since almost all the picketing occurred there prior to the issuance of the injunction. We reject the notion that an injunction that by its terms clearly prohibits entry onto the entire mall premises to picket should be given the reading suggested by the respondents simply because it is broader than the facts at the time required. The injunction is presently still operative and no limiting construction has been placed on it by the Pennsylvania courts. We see nothing to suggest that petitioners could not be immediately cited for contempt if they violated the plain terms of the injunction, whatever its relationship to their previous conduct may be. As for handbilling, the opinion of the trial court reveals that it was prepared to enjoin the handbilling being carried on along

ment that the picketing take place outside the shopping center renders it very difficult for petitioners to limit its effect to Weis only.[12]

It is therefore clear that the restraints on picketing and trespassing approved by the Pennsylvania courts here substantially hinder the communication of the ideas which petitioners seek to express to the patrons of Weis. The fact that the nonspeech aspects of petitioners' activity are also rendered less effective is not particularly compelling in light of the absence of any showing, or reliance by the state courts thereon, that the patrolling accompanying the picketing sought to be carried on was significantly interfering with the use to which the mall property was being put by both respondents and the general public.[13] As we observed earlier, the mere fact that speech is accompanied by conduct does not mean that the speech can be suppressed under the guise of prohibiting the conduct. Here it is perfectly clear that a prohibition against trespass on the mall operates to bar all speech within the shopping center to which respondents object. Yet this Court stated many years ago, "[O]ne is not to have the exercise of his liberty

the berms had respondents so requested. Given that, the suggestion that the absolute prohibition against petitioners' trespassing on the mall does not include handbilling is likewise untenable. We do not treat petitioners' right to distribute leaflets separately in this opinion simply because a holding that petitioners are entitled to picket within the mall obviously extends to handbilling as well and also because petitioners themselves make no separate issue of it.

[12] Petitioners point out that they could conceivably find themselves charged with conducting an illegal secondary boycott if they do not comply with the rules laid down by the NLRB and the courts governing common situs picketing. Compare *Electrical Workers Local 761* v. *NLRB,* 366 U. S. 667 (1961).

[13] Moreover, the parts of the injunction not contested by petitioners already went a long way towards preventing any such interference. See n. 4, *supra.*

of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider* v. *State,* 308 U. S. 147, 163 (1939).

The sole justification offered for the substantial interference with the effectiveness of petitioners' exercise of their First Amendment rights to promulgate their views through handbilling and picketing is respondents' claimed absolute right under state law to prohibit any use of their property by others without their consent. However, unlike a situation involving a person's home, no meaningful claim to protection of a right of privacy can be advanced by respondents here. Nor on the facts of the case can any significant claim to protection of the normal business operation of the property be raised. Naked title is essentially all that is at issue.

The economic development of the United States in the last 20 years reinforces our opinion of the correctness of the approach taken in *Marsh.* The large-scale movement of this country's population from the cities to the suburbs has been accompanied by the advent of the suburban shopping center, typically a cluster of individual retail units on a single large privately owned tract. It has been estimated that by the end of 1966 there were between 10,000 and 11,000 shopping centers in the United States and Canada, accounting for approximately 37% of the total retail sales in those two countries.[14]

These figures illustrate the substantial consequences for workers seeking to challenge substandard working conditions, consumers protesting shoddy or overpriced merchandise, and minority groups seeking nondiscriminatory hiring policies that a contrary decision here would have. Business enterprises located in downtown areas would be subject to on-the-spot public criti-

[14] Kaylin, A Profile of the Shopping Center Industry, Chain Store Age, May 1966, at 17.

cism for their practices, but businesses situated in the suburbs could largely immunize themselves from similar criticism by creating a *cordon sanitaire* of parking lots around their stores. Neither precedent nor policy compels a result so at variance with the goal of free expression and communication that is the heart of the First Amendment.

Therefore, as to the sufficiency of respondents' ownership of the Logan Valley Mall premises as the sole support of the injunction issued against petitioners, we simply repeat what was said in *Marsh* v. *Alabama,* 326 U. S., at 506, "Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." Logan Valley Mall is the functional equivalent of a "business block" and for First Amendment purposes must be treated in substantially the same manner.[15]

The judgment of the Supreme Court of Pennsylvania is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Mr. Justice Douglas, concurring.

Picketing on the public walkways and parking area in respondents' shopping center presents a totally different question from an invasion of one's home or place

---

[15] A number of state courts have reached similar conclusions as to shopping centers. See, *e. g., Schwartz-Torrance Investment Corp.* v. *Bakery Workers Local 31,* 61 Cal. 2d 766, 394 P. 2d 921 (1964), cert. denied, 380 U. S. 906 (1965); *Moreland Corp.* v. *Retail Store Employees Local 444,* 16 Wis. 2d 499, 114 N. W. 2d 876 (1962). Compare *Amalgamated Clothing Workers* v. *Wonderland Shopping Center, Inc.,* 370 Mich. 547, 122 N. W. 2d 785 (1963) (affirming four-to-four a lower court holding that handbilling in a shopping center is protected by the First Amendment).

of business. While Logan Valley Mall is not dedicated to public use to the degree of the "company town" in *Marsh* v. *Alabama,* 326 U. S. 501, it is clear that respondents have opened the shopping center to public uses. They hold out the mall as "public" for purposes of attracting customers and facilitating delivery of merchandise. Picketing in regard to labor conditions at the Weis Supermarket is directly related to that shopping center business. Why should respondents be permitted to avoid this incidence of carrying on a public business in the name of "private property"? It is clear to me that they may not, when the public activity sought to be prohibited involves constitutionally protected expression respecting their business.

Picketing is free speech *plus,* the *plus* being physical activity that may implicate traffic and related matters. Hence the latter aspects of picketing may be regulated. See *Bakery Drivers Local* v. *Wohl,* 315 U. S. 769, 776–777 (concurring opinion); *Hughes* v. *Superior Court,* 339 U. S. 460, 464–465; *Building Service Union* v. *Gazzam,* 339 U. S. 532, 536–537. Thus, the provisions of the injunction in this case which prohibit the picketers from interfering with employees, deliverymen, and customers are proper. It is said that the picketers may be banished to the publicly owned berms, several hundred feet from the target of their criticism. But that is to make "private property" a sanctuary from which some members of the public may be excluded merely because of the ideas they espouse. Logan Valley Mall covers several acres and the number of picketers at any time has been small. The courts of Pennsylvania are surely capable of fashioning a decree that will ensure noninterference with customers and employees, while enabling the union members to assemble sufficiently close to Weis' market to make effective the exercise of their First Amendment rights.

Mr. Justice Black, dissenting.

While I generally accept the factual background of this case presented in the Court's opinion, I think it is important to focus on just where this picketing which was enjoined by the state courts was actually taking place. The following extract is taken from the trial court's "Findings of Fact": [1]

"(7) . . .

"(a) small groups of men and women wearing placards . . . walked back and forth in front of the Weis supermarket, more particularly *in the pick-up zone* adjacent to the covered porch [emphasis added];

"(b) occasional picketing as above described has taken place *on the covered porch itself* [emphasis added]";

Respondent Weis Markets, Inc., the owner-occupant of the supermarket here being picketed, owns the real property on which it constructed its store, porch, and parcel pickup zone. Respondent Logan Valley Plaza, Inc., owns the other property in the shopping center, including the large area which has been paved and marked off as a general parking lot for customers of the shopping center.

Anyone familiar with the operations of a modern-day supermarket knows the importance of the so-called "pick-up zone"—an area where the frequently numerous bags of groceries bought in the store can be loaded conveniently into the customers' cars. The phenomenon of the supermarket combined with widespread ownership of automobiles and refrigeration facilities has made the purchase of large quantities of groceries on a single

---

[1] This appears in the opinion of the Court of Common Pleas of Blair County, Pennsylvania, dated February 14, 1966, and unreported.

shopping trip a common occurrence in this country. And in line with this trend the stores have had to furnish adequate loading areas and facilities including in many instances, such as here for example, extra employees to assist in loading customers' cars. Respondent Weis' parcel pickup zone is fairly typical of the type of loading area that has been provided: it is located alongside the front of the store and is 4 to 5 feet wide, 30 to 40 feet in length, and is marked off with bold double yellow lines; the words "Parcel Pick-Up" are printed in large letters in the zone. Testimony at trial showed that this pickup area was used "strictly for customers to come and enter to pick up their parcels which they had purchased. . . . They drive into this particular area, and there the groceries are loaded into the cars by [Weis employees] on . . . pick-up duty."

It seems clear to me, in light of the customary way that supermarkets now must operate, that pickup zones are as much a part of these stores as the inside counters where customers select their goods or the check-out and bagging sections where the goods are paid for. I cannot conceive how such a pickup zone, even by the wildest stretching of *Marsh* v. *Alabama,* 326 U. S. 501, could ever be considered dedicated to the public or to pickets. The very first section of the injunction issued by the trial court in this case recognizes this fact and is aimed only at protecting this clearly private property from trespass by the pickets. Thus the order of the court separately enjoins petitioners from:

"(a) Picketing and trespassing upon the private property of the plaintiff Weis Markets, Inc., Store No. 40, located at Logan Valley Mall, Altoona, Pennsylvania, including as such private property the storeroom, porch and parcel pick-up area."

While there is language in the majority opinion which indicates that the state courts may still regulate picket-

ing on respondent Weis' private property,[2] this is not sufficient. I think that this Court should declare unequivocally that Section (a) of the lower court's injunction is valid under the First Amendment and that petitioners cannot, under the guise of exercising First Amendment rights, trespass on respondent Weis' private property for the purpose of picketing.[3] It would be just as sensible for this Court to allow the pickets to stand on the checkout counters, thus interfering with customers who wish to pay for their goods, as it is to approve picketing in the pickup zone which interferes with customers' loading of their cars. At the very least, this wholly severable part of the injunction aimed at the pickup zone should be affirmed by the Court as valid under the First Amendment. And this is in fact the really important part of the injunction since, as the Court's opinion admits, "[t]he picketing was carried out almost entirely in the parcel pickup area and that portion of the parking lot immediately adjacent thereto."

I would go further, however, and hold that the entire injunction is valid.[4] With the exception of the Weis

[2] The majority opinion contains the following statement: "Because the Pennsylvania courts have held that 'picketing and trespassing' can be prohibited absolutely on respondents' premises, we have no occasion to consider the extent to which respondents are entitled to limit the location and manner of the picketing or the number of pickets within the mall in order to prevent interference with either access to the market building or vehicular use of the parcel pickup area and parking lot." *Ante*, at 321. This statement ignores the fact that the injunction order of the Common Pleas Court contains separately designated sections which are easily divisible.

[3] Since the majority opinion does not reach any issue under the National Labor Relations Act, 29 U. S. C. § 141 *et seq.*, neither do I. My declaration concerning the validity of the injunction is concerned with the First and Fourteenth Amendments. I do not find that the injunction, and most importantly § (a), violates any First Amendment rights.

[4] See n. 3, *supra*.

property mentioned above, the land on which this shopping center (composed of only two stores at the time of trial and approximately 17 now) is located is owned by respondent Logan Valley Plaza, Inc. Logan has improved its property by putting shops and parking spaces thereon for the use of business customers. Now petitioners contend that they can come onto Logan's property for the purpose of picketing and refuse to leave when asked, and that Logan cannot use state trespass laws to keep them out. The majority of this Court affirms petitioners' contentions. But I cannot accept them, for I believe that, whether this Court likes it or not, the Constitution recognizes and supports the concept of private ownership of property. The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." This means to me that there is no right to picket on the private premises of another to try to convert the owner or others to the views of the pickets. It also means, I think, that if this Court is going to arrogate to itself the power to act as the Government's agent to take a part of Weis' property to give to the pickets for their use, the Court should also award Weis just compensation for the property taken.

In affirming petitioners' contentions the majority opinion relies on *Marsh* v. *Alabama, supra,* and holds that respondents' property has been transformed to some type of public property. But *Marsh* was never intended to apply to this kind of situation. *Marsh* dealt with the very special situation of a company-owned town, complete with streets, alleys, sewers, stores, residences, and everything else that goes to make a town. The particular company town involved was Chickasaw, Alabama, which, as we stated in the opinion, except for the fact

that it "is owned by the Gulf Shipbuilding Corporation . . . has all the characteristics of any other American town. The property consists of residential buildings, streets, a system of sewers, a sewage disposal plant and a 'business block' on which business places are situated." 326 U. S., at 502. Again toward the end of the opinion we emphasized that "the town of Chickasaw does not function differently from any other town." 326 U. S., at 508. I think it is fair to say that the basis on which the *Marsh* decision rested was that the property involved encompassed an area that for all practical purposes had been turned into a town; the area had all the attributes of a town and was exactly like any other town in Alabama. I can find very little resemblance between the shopping center involved in this case and Chickasaw, Alabama. There are no homes, there is no sewage disposal plant, there is not even a post office on this private property which the Court now considers the equivalent of a "town." [5] Indeed, at the time this injunction was issued, there were only two stores on the property. Now there are supposed to be about 17, but they are all conceded to be "commercial establishments." The remainder of the property in the center has been laid out as a large parking lot with individually marked parking spaces provided for business customers. All I can say is that this sounds like a very strange "town" to me.

The majority opinion recognizes the problem with trying to draw too close an analogy to *Marsh,* but faces a dilemma in that *Marsh* is the only possible authority for treating admittedly privately owned property the way the majority does. Thus the majority opinion concedes that "the respondents here do not own the

---

[5] In *Marsh* v. *Alabama, supra,* a deputy of the Mobile County Sheriff, paid by the company, served as the town's policeman. We are not told whether the Logan Valley Plaza shopping center had its own policeman.

surrounding residential property and do not provide municipal services therefor." But that is not crucial, according to the majority, since the petitioner in *Marsh* was arrested in the business district of Chickasaw. The majority opinion then concludes that since the appellant in *Marsh* was given access to the business district of a company town, the petitioners in this case should be given access to the shopping center which was functioning as a business district. But I respectfully suggest that this reasoning completely misreads *Marsh* and begs the question. The question is, Under what circumstances can private property be treated as though it were public? The answer that *Marsh* gives is when that property has taken on *all* the attributes of a town, *i. e.,* "residential buildings, streets, a system of sewers, a sewage disposal plant and a 'business block' on which business places are situated." 326 U. S., at 502. I can find nothing in *Marsh* which indicates that if one of these features is present, *e. g.,* a business district, this is sufficient for the Court to confiscate a part of an owner's private property and give its use to people who want to picket on it.

In allowing the trespass here, the majority opinion indicates that Weis and Logan invited the public to the shopping center's parking lot. This statement is contrary to common sense. Of course there was an implicit invitation for customers of the adjacent stores to come and use the marked off places for cars. But the whole public was no more wanted there than they would be invited to park free at a pay parking lot. Is a store owner or are several owners together less entitled to have a parking lot set aside for customers than other property owners? To hold that store owners are compelled by law to supply picketing areas for pickets to drive store customers away is to create a court-made law wholly disregarding the constitutional basis on which private

ownership of property rests in this country. And of course picketing, that is patrolling, is not free speech and not protected as such. *Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490; *Hughes* v. *Superior Court,* 339 U. S. 460. These pickets do have a constitutional right to speak about Weis' refusal to hire union labor, but they do not have a constitutional right to compel Weis to furnish them a place to do so on its property. *Cox* v. *Louisiana,* 379 U. S. 559; *Adderley* v. *Florida,* 385 U. S. 39; *Cameron* v. *Johnson,* 390 U. S. 611.

For these reasons I respectfully dissent.

MR. JUSTICE HARLAN, dissenting.

The petitioners argue for reversal of the decision below on two separate grounds: first, that petitioners' picketing was protected by the First Amendment from state injunctive interference of this kind; second, that the Pennsylvania courts have strayed into a sphere where the power of initial decision is reserved by federal labor laws to the National Labor Relations Board. I think that, if available, the second or "pre-emption" ground would plainly be a preferable basis for decision. Because reliance on pre-emption would invoke the authority of a federal statute through the Constitution's Supremacy Clause, it would avoid interpretation of the Constitution itself, which would be necessary if the case were treated under the First Amendment. See, *e. g., Zschernig* v. *Miller,* 389 U. S. 429, 443, 444-445 (opinion of the writer concurring in the result). Dependence on pre-emption would also assure that the Court does not itself disrupt the statutory scheme of labor law established by the Congress, a point to which I shall return.

On the merits, it seems clear from the facts stated by the Court, see *ante,* at 310–312, and from our past decisions [1]

---

[1] See, *e. g., Construction Laborers* v. *Curry,* 371 U. S. 542, 546–548; *Hotel Employees Local 255* v. *Sax Enterprises, Inc.,* 358 U. S.

that the petitioners have a substantial pre-emption claim. However, upon examination of the record I have come reluctantly to the conclusion that this Court is precluded from reaching the merits of that question because of the petitioners' failure to raise any such issue in the Pennsylvania Supreme Court. The rule that in cases coming from state courts this Court may review only those issues which were presented to the state court is not discretionary but jurisdictional. Section 1257 of Title 28, which defines this Court's certiorari jurisdiction, states:

> "Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court . . . [b]y writ of certiorari, . . . where any title, right, privilege or immunity is specially set up or claimed under the Constitution, treaties or statutes of . . . the United States."

Since the Pennsylvania Supreme Court did not advert in its majority opinion to the pre-emption issue,[2] it is necessary to determine whether that question was "specially set up or claimed" within the meaning of § 1257. In deciding that question, it is relevant and usually sufficient to ask whether the petitioners satisfied the state rules governing presentation of issues. See, *e. g., Beck* v. *Washington,* 369 U. S. 541, 549–554; *Wolfe* v. *North*

---

270; *Youngdahl* v. *Rainfair, Inc.,* 355 U. S. 131, 139; *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105, 112–114; *NLRB* v. *Stowe Spinning Co.,* 336 U. S. 226, 229–232; cf. *Amalgamated Meat Cutters* v. *Fairlawn Meats, Inc.,* 353 U. S. 20, 24–25. See also *Marshall Field & Co.,* 98 N. L. R. B. 88, 93, enforced as modified *sub nom. Marshall Field & Co.* v. *NLRB,* 200 F. 2d 375, 380.

[2] Where the highest state court has actually ruled on a federal question, this Court's concern with the proper raising of the question in the state court disappears. See, *e. g., Raley* v. *Ohio,* 360 U. S. 423, 436; *Whitney* v. *California,* 274 U. S. 357, 360–361; *Manhattan Life Ins. Co.* v. *Cohen,* 234 U. S. 123, 134.

*Carolina,* 364 U. S. 177, 195; *John* v. *Paullin,* 231 U. S. 583, 585.[3] Rule 59 of the Pennsylvania Supreme Court provides:

> "The [appellant's] statement of the questions involved must set forth each question separately, in the briefest and most general terms . . . . This rule is to be considered in the highest degree mandatory, admitting no exception; ordinarily no point will be considered which is not thus set forth in or necessarily suggested by the statement of questions involved."

The Pennsylvania Supreme Court has consistently held that it will not consider points not presented in the manner prescribed by this rule, and that such points are regarded as abandoned or waived.[4] In this case, the petitioners' statement of questions involved did not refer to the possibility of federal pre-emption,[5] and of course the Pennsylvania Supreme Court's majority opinion did not mention it either. A similar rule of the Washington

---

[3] The only circumstances in which a federal claim will be entertained despite the petitioners' failure to raise it below in the prescribed manner are when the State's rules do not afford a reasonable opportunity for a hearing on the federal issue, see, *e. g., Central Union Tel. Co.* v. *Edwardsville,* 269 U. S. 190, 194–195, or are applied in a discriminatory fashion to evade the federal claim, see, *e. g., Hartford Life Ins. Co.* v. *Johnson,* 249 U. S. 490, 493. No such allegation is made in this case.

[4] See, *e. g., Dunmore* v. *McMillan,* 396 Pa. 472, 152 A. 2d 708; *Kuhns* v. *Brugger,* 390 Pa. 331, 135 A. 2d 395; *Kerr* v. *O'Donovan,* 389 Pa. 614, 134 A. 2d 213.

[5] The petitioners stated that the question involved was:

"Did the lower court err in granting a Preliminary Injunction . . . where in a suit in equity by the owner of a shopping center and one of its tenants it is established that the appellant-union peacefully picketed near tenant's building within the confines of said shopping center; that no picketing efforts were directed toward the shopping center or other tenants; that picketing efforts were merely to inform the public of the labor dispute?"

Supreme Court was involved in *Beck* v. *Washington,* *supra,* and we held that when a defendant has failed to comply with such a rule "the argument cannot be entertained here under an unbroken line of precedent. *E. g.,* *Ferguson* v. *Georgia,* 365 U. S. 570, 572 (1961); *Capital City Dairy Co.* v. *Ohio,* 183 U. S. 238, 248 (1902)." 369 U. S., at 553–554.[6] I am therefore led to conclude that we have no jurisdiction to consider the question of pre-emption.[7]

Turning to the First Amendment question, I believe that in the circumstances it is not an appropriate one for this Court to decide. This controversy arose in the course of a labor union's efforts to achieve labor goals by informational picketing. Although no pre-emption question is properly before us, I do think that we can take notice that this is an area in which Congress has enacted detailed legislation, see, *e. g.,* 29 U. S. C. § 158 (b)(7)(C), and has set up an administrative agency to resolve such disputes in the first instance. The reason why it was deemed necessary to fashion the doctrine of pre-emption under the federal labor laws was that it would be intolerably disruptive if this statutory scheme were interpreted differently by state and federal courts. See, *e. g.,* *Garner* v. *Teamsters Union,* 346 U. S. 485, 490–491; *San Diego Unions* v. *Garmon,* 359 U. S. 236, 242–245. It seems to me that a similar objection applies to this Court's resolution of such disputes by resort to the

---

[6] See also *Wolfe* v. *North Carolina,* 364 U. S. 177, 195; *Parker* v. *Illinois,* 333 U. S. 571; *CIO* v. *McAdory,* 325 U. S. 472, 477.

[7] The petitioners contend that this Court has jurisdiction to consider the pre-emption issue despite the petitioners' failure to raise it below, because the question is one of "subject matter jurisdiction." Although some implied support for this proposition may be found in *Seaboard Air Line R. Co.* v. *Daniel,* 333 U. S. 118, 122–123, I am unable to perceive how the nature of the federal question involved can affect the specific limitation on our jurisdiction contained in 28 U. S. C. § 1257.

Constitution. For the establishment by this Court of a rigid constitutional rule in a field where Congress has attempted to strike a delicate balance between competing economic forces, and in circumstances where we cannot know how the controversy would be settled by Congress' chosen instrument, may also have a considerable disruptive effect. I therefore believe that we should exercise our discretion not to reach the First Amendment issue, and that we should dismiss the writ as improvidently granted. Such a disposition would not be unfair to the petitioners, since the failure to bring the preemption question properly before us was their own.

MR. JUSTICE WHITE, dissenting.

The reason why labor unions may normally picket a place of business is that the picketing occurs on public streets which are available to all members of the public for a variety of purposes that include communication with other members of the public. The employer businessman cannot interfere with the pickets' communication because they have as much right to the sidewalk and street as he does and because the labor laws prevent such interference under various circumstances; the Government may not interfere on his behalf, absent obstruction, violence, or other valid statutory justification, because the First Amendment forbids official abridgment of the right of free speech.

In *Marsh* v. *Alabama,* 326 U. S. 501 (1946), the company town was found to have all of the attributes of a state-created municipality and the company was found effectively to be exercising official power as a delegate of the State. In the context of that case, the streets of the company town were as available and as dedicated to public purposes as the streets of an ordinary town. The company owner stood in the shoes of the State in attempting to prevent the streets from being used as public streets are normally used.

The situation here is starkly different. As MR. JUSTICE BLACK so clearly shows, Logan Valley Plaza is not a town but only a collection of stores. In no sense are any parts of the shopping center dedicated to the public for general purposes or the occupants of the Plaza exercising official powers. The public is invited to the premises but only in order to do business with those who maintain establishments there. The invitation is to shop for the products which are sold. There is no general invitation to use the parking lot, the pickup zone, or the sidewalk except as an adjunct to shopping. No one is invited to use the parking lot as a place to park his car while he goes elsewhere to work. The driveways and lanes for auto traffic are not offered for use as general thoroughfares leading from one public street to another. Those driveways and parking spaces are not public streets and thus available for parades, public meetings, or other activities for which public streets are used. It may be more convenient for cars and trucks to cut through the shopping center to get from one place to another, but surely the Court does not mean to say that the public may use the shopping center property for this purpose. Even if the Plaza has some aspects of "public" property, it is nevertheless true that some public property is available for some uses and not for others; some public property is neither designed nor dedicated for use by pickets or for other communicative activities. *E. g., Adderley* v. *Florida,* 385 U. S. 39 (1966). The point is that whether Logan Valley Plaza is public or private property, it is a place for shopping and not a place for picketing.

The most that can be said is that here the public was invited to shop, that except for their location in the shopping center development the stores would have fronted on public streets and sidewalks, and that the shopping center occupied a large area. But on this

premise the parking lot, sidewalks, and driveways would be available for all those activities which are usually permitted on public streets. It is said that Logan Valley Plaza is substantially equivalent to a business block and must be treated as though each store was bounded by a public street and a public sidewalk. This rationale, which would immunize nonobstructive labor union picketing, would also compel the shopping center to permit picketing on its property for other communicative purposes, whether the subject matter concerned a particular business establishment or not. Nonobstructive handbilling for religious purposes, political campaigning, protests against government policies—the Court would apparently place all of these activities carried out on Logan Valley's property within the protection of the First Amendment, although the activities may have no connection whatsoever with the views of the Plaza's occupants or with the conduct of their businesses.

Furthermore, my Brother BLACK is surely correct in saying that if the invitation to the public is sufficient to permit nonobstructive picketing on the sidewalks, in the pickup zone, or in the parking area, only actual interference with customers or employees should bar pickets from quietly entering the store and marching around with their message on front and back.

It is not clear how the Court might draw a line between "shopping centers" and other business establishments which have sidewalks or parking on their own property. Any store invites the patronage of members of the public interested in its products. I am fearful that the Court's decision today will be a license for pickets to leave the public streets and carry out their activities on private property, as long as they are not obstructive. I do not agree that when the owner of private property invites the public to do business with him he impliedly dedicates his property for other uses as well. I do not think the

First Amendment, which bars only official interferences with speech, has this reach. In *Marsh,* the company ran an entire town and the State was deemed to have devolved upon the company the task of carrying out municipal functions. But here the "streets" of Logan Valley Plaza are not like public streets; they are not used as thoroughfares for general travel from point to point, for general parking, for meetings, or for Easter parades.

If it were shown that Congress has thought it necessary to permit picketing on private property, either to further the national labor policy under the Commerce Clause or to implement and enforce the First Amendment, we would have quite a different case. But that is not the basis on which the Court proceeds, and I therefore dissent.