## STATE OF FLORIDA v. GREGG
No. 83-2379
County Court, Monroe County
August 2, 1983

Kirk C. Zuelch, State Attorney, Jonathan G. Ellsworth, Asst. State Attorney, for plaintiff.

Robert C. Gebhardt, Jordan, Melrose & Schuette, for defendant.

J. ALLISON DeFOOR, II, County Judge

THIS CAUSE came on to be heard upon the defendant's Motion to Dismiss dated June 22, 1983, predicated upon the alleged unconstitutionality of F.S. §316.2055. The facts which gave rise to this case are relatively simple and have been fairly stated by the defendant in her Memorandum in Support of Motion to Dismiss, and stipulated to by the State. Defendant is employed, or may alternatively have had an independent contractual relationship with Holiday Interval Ownership, Inc. (hereinafter referred to as "Holiday"). Holiday is a Florida corporation engaged in the principal business of developing and selling interval ownership units of Ocean 80 Florida, located at U.S. 1, Mile Marker 80, Islamorada, Florida. In connection with the ownership and sale of these units, Holiday has retained independent contractors/employees to distribute sales information material to motorists on U.S. 1 in the Florida Keys, located in Monroe County, Florida. One location in which Holiday distributes the sales literature is the drawbridge between Plantation Key and Matecumbe Key in Monroe County, otherwise known as the Snake Creek Bridge. The bridge is a drawbridge, and while the bridge is raised, and traffic along U.S. 1 is essentially stopped, the employees/independent contractors of Holiday distribute Holiday's advertising literature. Distribution takes place only while the drawbridge is raised and traffic is substantially halted. On April 22, 1983, an employee/independent contractor of Holiday, one MARY GREGG, the defendant in this cause, was distributing Holiday sales information

literature at said drawbridge while the bridge was raised and traffic was substantially stopped. She was cited and charged with violating F.S. §316.2055 (1981). The alleged violation is a civil traffic infraction, and accordingly the defendant faces a maximum penalty of a $500 fine and no term of imprisonment or incarceration. The defendant has sought a dismissal of the citation filed in this cause and/or an injunction prohibiting enforcement of the statute and/or a declaration that the statute is unconstitutional under the Florida Constitution and the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment. Lacking the jurisdiction to issue an injunction prohibiting the enforcement of F.S. §316.2055, the Court is then left with the only viable portions of defendant's petition, those seeking to declare the statute unconstitutional and/or dismissing the citation, which would have the same effect.

Argument in support of defendant's motion was held on July 6, 1983. At the hearing in support of the Motion to Dismiss, the defendant abandoned her initial memorandum in support of the Motion to Dismiss, except for the introduction and statement of fact. Instead offered was a supplemental memorandum in support of the Motion to Dismiss, with the defendant asserting that it more aptly stated applicable federal and state case law. The State offered its own cases in support of this proposition that the statute was constitutional. And thus, the stage is set for the resolution of complex legal issues concerning commercial speech and the First Amendment.

It is not without a great deal of trepidation that the Court enters the legal waters of commercial free speech and the First Amendment. The Court notes initially that courts much higher and much better equipped than this court have been baffled seeking the parameters of this emerging area of the law. Nonetheless, we are compelled to plunge on.

The application of First Amendment principles to pure commercial speech is a relatively recent phenomenon. Previously it was held that commercial speech was beyond the area protected by the First Amendment to the United States Constitution. *Valentine v. Christensen,* 316 U.S. 52 (1942). The case of *Bigelow v. Virginia,* 421 U.S. 809 (1975), extended the concepts of First Amendment law to purely commercial advertisements of services and goods for sale. From this seminal case, the protections afforded commercial speech by the First Amendment have significantly

expanded over recent years.[1] Commercial speech, however, is not protected as strongly as non-commercial speech.[2] The most recent interpretation of the law on this point being found, if somewhat confusingly, due to the plurality opinion, in *Metromedia v. San Diego,* 453 U.S. 490 (1981).

Perhaps the most significant point on this case to date is that of *Central Hudson Gas and Electric Corp. v. Public Service Commission,* 477 U.S. 557 (1980). The *Hudson* case adopted a four-part test for determining the validity of governmental restrictions of commercial speech (as distinguished from more fully protected speech):

1. The First Amendment protects commercial speech only if that speech concerns lawful activity and is not misleading;

2. The restriction on otherwise protected commercial free speech is valid only if it seeks to implement a substantial interest;

3. It must directly advance that interest; and

4. It must reach no further than is necessary to accomplish the given objective.

*Metromedia* at U.S. 507, quoting *Hudson* at U.S. 563-566.

To be applied against this standard, which both sides were kind enough to concede is the operative standard of law, we have the statute itself.

---

[1]So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable. And if it is indispensable to the proper allocation of resources in a free enterprise system, it is also indispensable to the formation of intelligent opinions as to how that system ought to be regulated or altered. Therefore, even if the First Amendment were thought to be primarily an instrument to enlighten public decisionmaking in a democracy, we could not say that the free flow of information does not serve that goal [citations omitted.] *Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

[2]"To require a parity of constitutional protection for commercial and non-commercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a trivialization, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of non-commercial expression. (Citations and footnotes omitted)." *Ohralik v. Ohio State Bar Assoc.,* 436 U.S. 445, 456 (1978). It is presumed that commercial speech is less susceptible to being chilled or muted due to the commercial incentive. *Hudson, infra* at 447 U.S. 564.

F.S. §316.0255 (1981) provides as follows:

"it is unlawful for any person on a public street, highway, or sidewalk in the state to throw into or attempt to throw into any motor vehicle, or offer, or attempt to offer, to any occupant of any motor vehicle, whether standing or moving, or to place or to throw into any motor vehicle any advertising or soliciting materials or to cause to secure any person or persons to do any one of such unlawful acts."

1) Applying the standard to the facts, it is generously conceded by the State that the pamphlet in question, a copy of which is appended to this opinion, concerns a lawful activity and is not misleading (a trait which may not be shared by all such handouts concerning timesharing sales efforts); therefore, the threshold consideration of the *Hudson* test is met.

2) Moving on, to the second consideration of the four-part *Hudson* test, the issue becomes, what substantial government interest is being implemented?

A fair reading of the statute can find it to be directed at traffic safety. This is supported by the placement of the statutes in Chapter 316, entitled "State Uniform Traffic Control." As stated in F.S. §316.022, "It is the legislative intent in the adoption of this chapter to make uniform traffic laws apply through the state and its several counties and uniform traffic ordinances to apply in all municipalities." It is further stated in F.S. §316.003 (58) that traffic is defined as "pedestrians, ridden or herded animals, and vehicles, streetcars, and other conveyances, either singly or together, while using any street or highway for purposes of travel." The Court accordingly finds that the governmental interest served by this statute is that of traffic safety.

Having thus concluded that the governmental interest to be served is that of traffic safety, it is clear that the statute survives the second of the four-part test set forth in *Hudson*. "Nor can there be substantial doubt that the goal (of) traffic safety (is) substantial," *Metromedia* at U.S. 507.

3) Moving on to the third test, the question becomes whether the state action directly advances that interest. The defense, in its supplemental memorandum in support of its Motion to Dismiss, states: "There is no evidence before this Court that shows that distributing pamphlets constitutes a traffic danger," at page 6. The Court will take judicial notice of that which is known by any citizen, whether from the Conch Republic or the mainland, who has traveled upon U.S. 1: That the intermixing of

pedestrians and highway traffic on or near U.S. 1 offers hazard to both.

The unique demands placed upon U.S. 1 as it threads its way 120 miles from the Jewfish Creek Bridge through the Florida Keys to Key West make it uniquely hazardous. It is on one hand the main street for each and all of the communities scattered down the Keys, such as Tavernier, Islamorada, Marathon and Key West. It is on the other hand the equivalent of I-95 for all of those same communities serving as the intercity link, and the only link of the Keys with the world.

Placed upon this uniquely difficult highway are impatient locals, Winnabagoes full of gawking passengers, tourists of all stripes, many of whom have come to the Keys for one purpose and one purpose alone, to relax and forget their cares in an atmosphere which the locals concede to be Paradise.

It is said that one's watch slows down on crossing the Jewfish Creek Bridge. The Court will concede that while that may be the case, the consumption of intoxicating substances increases accordingly for those down here to relax and recreate. A mixture of all of these ingredients produces a very hazardous combination. The Court accordingly finds that the presence of pedestrians on or near U.S. 1 constitutes a potential hazard to both pedestrians and vehicular traffic alike. Accordingly, the State, by seeming to separate the vehicular and pedestrian traffic, directly advances this interest.

4) The Court's entire concern, then, in this consideration of the constitutionality of this statute, boils itself down to the fourth part of the *Hudson* test: Whether the State activity reaches further than necessary to accomplish the given objective.[3]

In making a determination of whether the State activity reaches further than necessary to accomplish the given objective, inquiry includes the examination as to whether the ordinance is a reasonable time, place and manner restriction.[4] Such restrictions as to time, place and manner of an activity and of commercial free speech ''are justified without reference to the contents of the regulated speech, that they serve a

---

[3] . . . the First Amendment mandates that speech restrictions be narrowly drawn. The regulatory technique may extend only as far as the interest it serves. The State cannot regulate speech that poses no danger to the asserted state interest, nor can it completely suppress information when narrower restrictions on expression would serve its interests as well. (Citations omitted.) *Hudson,* at U.S. 565.

[4] *State v. Bloss,* 637 P.2d 1117, 1126 (Hawaii 1982).

significant governmental interest, and that they leave open ample alternative channels for communication of the information.''

*Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S. 748, at 771 (1976).

The ''significant governmental interest'' portion of this time, place and manner analysis has already been dealt with, at pages 3 and 4 *supra.* With regard to the issue that the governmental regulation be without reference to the content of the regulated speech, the Court would note that in this instance all commercial handbills are apparently banned. There is no danger presented in this statute of the government attempting to act as ''editor'' of the content of the commercial speech allowed to reach the consumer. This is the evil which is sought to be protected against by the First Amendment.

The Court is aware of the analysis embraced by the defense of the case of *State v. Bloss,* 637 P.2d 1117 (Hawaii 1981), at 1127, where the Court held that the offending ordinance's distinction between commercial and non-commercial handbilling proved to be constitutionally fatal. The Court is of the opinion, however, that the Supreme Court of Hawaii failed to perceive the lesson in the *Metromedia* case. The clear upshot *Metromedia* is that it is the failure to distinguish between commercial and non-commercial free speech which is constitutionally impermissible. *Metromedia* at U.S. 513.

The final consideration in the time, place and manner restriction analysis becomes whether there are ample alternative channels for communication of the information. See *Donnelly and Sons v. Campbell,* 639 Fed.2d 6, at 8 (1st Cir. 1980). The Court notes the availability of numerous other sources of reaching potential customers as they drive down the Keys, not the least of which are, ironically, numerous freshly painted billboards ready to bear the message of the defendant's employing corporation.

Another area of analysis related to the fourth part of the *Hudson* test is whether the manner of the expression is basically compatible with the normal activity of a particular place at a particular time. *Schad v. Borrough of Mt. Emphraim,* 452 U.S. 61 (1981); *Grayned v. City of Rockford,* 408 U.S. 104 (1972). There is no question in the mind of the Court that pamphleting as a general proposition is incompatible with the normal activity of U.S. 1 at any time.

This case involves persons attempting to pamphlet vehicles stopped for the raising of a drawbridge on U.S. 1. The defense would assert that the vehicles are stopped completely. Common sense would dictate that that is not the case. Vehicles will advance, some a small distance, some

a great distance, during the course of the bridge raising. Of course, the changes of the defendant's being crushed in the process between vehicles is a potential hazard. As is that of a car coming later and not seeing that the vehicles are stopped, or the defendant, alternatively, becoming so wrapped in her sales pitch that she doesn't see that the bridge is being raised.

It is noted that the defendant, in the supplemental memorandum in support of the Motion to Dismiss, seeks to equate the regulation of commercial handbills with that of political handbills addressing social causes, citing in support Supreme Court cases to disapprove restrictions on handbilling in public places.[5] Similarly, the defense has cited the Florida case of *Stevens et al. v. Strickle et al.,* 200 So. 396 (Fla. 1941), which the State has generously (but erroneously) conceded as being applicable. None of these cases cited contains a factual basis involving a commercial context, and accordingly the Court finds them inapposite.

The defendant has gone further in this theme and advanced arguments *ore tenus* and, in the supplemental memorandum, placing great reliance upon the concept of overbreadth. The defense has created a parade of horribles under which First Amendment rights would be oppressed by this statute in contexts other than those factually presented in the case at bar.[6]

Unfortunately for the defense, this Court may only rule on the constitutionality of this statute in the factual context which is presented by the case itself. The doctrine of overbreadth is simply not applicable to commercial speech. *Bates v. State Bar of Arizona,* 433 U.S. 350 (1977);[7] *Ohralik v. Ohio State Bar Association,* 436 U.S. 447 (1978).[8]

---

[5]There is, of course, no doubt by now that an ordinance totally banning handbilling in public places is unconstitutional. *Jamison v. Texas,* 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943); *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). *The "streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." Food Employees Local 590 v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 315, 88 S.Ct. 1601, 1606, 20 L.Ed.2d 603 (1968).

[6]The heel of oppression was hypothetically extended so far, both literally and allegorically, from the beaten path as Frostproof, Florida, a town of the Court's youth.

[7]"the justification for the application of overbreadth analysis applies weakly, if at all, in the ordinary commercial context." *Bates,* at 433 U.S. 380.

[8]Commercial speech is not as likely to be deterred as non-commercial speech, and therefore does not require the added protection afforded by the overbreadth approach. *Ohralik,* at 436 U.S. 462-63.

Accordingly, the defendant does not have standing, and the Court does not have the power to rule upon the constitutionality of the statute based upon potential application to a factual context asserted by the defendant based upon hypothetical facts arising in Frostproof, Florida.

Finally, the Court is persuaded in the wisdom of its reasoning further by the principle of law advanced by the defense based upon the remark of Justice Jackson in *Kovacs v. Cooper,* 336 U.S. 77 at 97 (1949): "Each method of communicating ideas is a law unto itself" and that law must reflect the "differing natures, values, abuses and dangers of each method." Fundamentally, the common sense of the citizen and the common sense of the law would surely agree that U.S. Highway 1 is not the place for handling out leaflets.

WHEREFORE, the defendant's Motion to Dismiss and Motion to Declare Florida Statute 316.2055 unconstitutional be and the same is hereby DENIED.