CHICAGO JOINT BOARD, AMALGA-
MATED CLOTHING WORKERS OF
AMERICA, AFL–CIO, Plaintiff,

v.

CHICAGO TRIBUNE COMPANY, Chicago American Publishing Company and Field Enterprises, Inc., Defendants.

No. 69 C 1898.

United States District Court
N. D. Illinois, E. D.
Dec. 19, 1969.

Milton I. Shadur, Robert Plotkin, R. Dickey Hamilton, and Stuart R. Cohn, of Devoe, Shadur, Mikva & Plotkin, Chicago, Ill., for the Chicago Joint Board.

Don H. Reuben, David W. Maher, and Calvin J. Collier, of Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., for the Chicago Tribune Co. and the Chicago American Publishing Co.

Robert B. Wilcox, A. Daniel Feldman, and David L. Lange, of Isham, Lincoln & Beale, Chicago, Ill., for Field Enterprises, Inc.

Gary Auerbach and David Goldberger, Chicago, Ill., of and for the American Civil Liberties Union, as amicus curiae.

Sherman Carmell and Sheldon Charone of Carmell & Charone, Chicago, Ill., for the Chicago Federation of Labor & Industrial Union Council, as amicus curiae.

## MEMORANDUM OPINION

MAROVITZ, District Judge.

Defendants' Motions for Summary Judgment

Plaintiff's Motion for Preliminary Injunction

This action arises from the refusal of the defendants, the Chicago Tribune Co. (Tribune), the Chicago American Publishing Co. (American), and Field Enterprises, Inc. (Field), to publish in their respective newspapers an advertisement submitted by the plaintiff, Chicago Joint Board, Amalgamated Clothing Workers of America, AFL–CIO (Union). The plaintiff is seeking both injunctive relief and compensatory and exemplary damages.

Plaintiff is a national labor union with numerous local unions in the Chicagoland area. Defendant Tribune is the owner and publisher of a major Chicago newspaper, the Chicago Tribune. Defendant American, which owns and publishes another major Chicago newspaper, Chicago Today, is a wholly owned subsidiary of defendant Tribune. Field is the owner and publisher of the Chicago Sun-Times and the Chicago Daily News, two other major metropolitan dailies.

Union is currently involved in a dispute with Marshall Field & Co., the owner and operator of Chicago's largest retail department store, regarding the sale of imported men's and boys' clothing. Marshall Field & Co. is a leading Chicagoland outlet for imported clothing. It is Union's position that the unrestricted sale of imported men's and boys' clothing will eliminate jobs for American workers manufacturing such clothing, that such a result would impose a hardship on those workers specifically and the American public generally, and that, consequently, retail outlets of foreign made clothing should refrain from the purchase and resale of such goods and the public should not buy them until such time as the exporting nations voluntarily agree to quotas on the amount

of clothing to be sent into the United States.

During the course of this dispute, which continues at this time, Union prepared and submitted to defendants an advertisement for publication in their respective newspapers. The ad explained why plaintiff was picketing Marshall Field & Co. and set forth Union's position on the sale of imported men's and boys' clothing. All four major metropolitan newspapers refused to publish the ad.

In Count I of its complaint, Union contends that defendants are quasi-public entities whose refusal to publish is a violation of plaintiff's constitutional rights to free speech and equal protection. Count II alleges that defendants' refusal to publish Union's ad constitutes a breach of contract, which contract arises from plaintiff's acceptance of an alleged standing offer by the defendants to print any lawful advertisement. Count III alleges that plaintiff justifiably relied to their detriment on representations by the defendants to the effect that they would publish any lawful advertisement. In its prayer for relief, Union asks that the defendants be permanently enjoined from refusing to publish the submitted ad, that during the pendency of this action similar equitable relief be afforded, or that defendants be enjoined from publishing any advertisement of Marshall Field & Co. for or including imported men's or boys' clothing. Union also seeks $1,000 in compensatory damages and $5,000 in exemplary damages.

Presently before the court are plaintiff's motion for a preliminary injunction and defendants' motions for summary judgment. The motion for preliminary injunction seeks the equitable relief found in the prayer of plaintiff's complaint. Field's motion for summary judgment contends that the complaint fails to state a claim upon which relief may be granted. In addition to this contention, the other defendants, in their motion for summary judgment, contend that this court lacks federal jurisdiction and that the granting of requested relief would violate defendants' rights to freedom of the press and free speech under the federal and state constitutions.

■ Initially, we note that summary judgment is appropriate where, as here, there are no material factual issues in dispute and only legal issues need be resolved. Silverstein v. United States, 293 F.Supp. 1106, 1110 (N.D.Ill.1968).

■ Counts II and III, which are based on contractual or quasi-contractual theories, have not been supported by any discussion in plaintiff's brief and may be dismissed easily. Under general contract theory, the presumption is that general advertising aimed at the public is not an offer to enter a contract.

"Neither the advertiser nor the reader of his notice understands that the latter is empowered to close the deal without further expression by the former. Such advertisements are understood to be mere requests to consider and examine and negotiate; and no one can reasonably regard them otherwise unless the circumstances are exceptional and the words used are very plain and clear." 1 Corbin, Contracts § 25, at 75 (1963).

*Cf.* Wall v. World Publishing Co., 263 P.2d 1010, 1012 (Okl.1953) (absent express promise, invitation by newspaper to readers to write letters on matters of public interest is not offer to publish all letters received in response).

■ None of the defendants has explicitly extended an offer to the general public to publish any lawful advertisement which is submitted for publication by a party who is willing and able to pay the standard advertising rate, nor has any defendant so represented that such a policy exists. In plain and clear words, each has reserved the right to reject any advertisement. See The Chicago Tribune Advertising Acceptability Guide, p. 3, submitted as Exhibit B to Complaint; "General Advertising Rates: Chicago Tribune, Chicago Today," (p. 12) submitted as Exhibit A to Affidavit,

¶ 3, of Mr. Charles B. Jordan; Affidavit of Mr. Howell Jones, p. 2. Parenthetically, the Tribune guidelines discuss the newspaper's concern with honesty, taste and effectiveness, and indicate that the newspaper will exclude material which, for instance, it feels is misleading, unfair, indecent or illegal. At this time, we need make no evaluation as to the reasonableness of this policy. It is sufficient for the purposes of ruling on the motion for summary judgment to find that the policy of reserving the right to reject advertisement exists and is apparent from a review of the newspapers various pamphlets concerning advertising.

Defendants' motions for summary judgment are granted as to Counts II and III.

We turn now to a consideration of the issues presented in the first count of the Complaint. As summarized previously, it is plaintiff's thesis that the defendants are quasi-public entities whose refusal to publish an advertisement setting forth plaintiff's position on a public issue is a violation of the plaintiff's constitutional rights to free speech and equal protection. Defendants' position is that their acts are private in nature and not subject to the asserted constitutional restrictions.

■■ The First Amendment to the United States Constitution provides that "Congress shall make no law * * * abridging the freedom of speech or of the press * * *." While by its language, this amendment is binding only on the national government, it has been extended through the due process clause of the Fourteenth Amendment to prohibit the impairment of fundamental rights by the various states. Fiske v. Kansas, 274 U.S. 380, 387, 47 S.Ct. 655, 71 L.Ed. 1108 (1927); Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). Yet, while the Fourteenth Amendment affords protection from state action as well as that from the national government, it does not protect against wrongs done by private persons.

United States v. Guest, 383 U.S. 745, 755, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); Motley v. Virginia Hardware and Manufacturing Co., 287 F.Supp. 790, 793 (W.D.Va.1968). As the "distinction between purely private discrimination and discrimination pursuant to 'state action'" persists, Huey v. Barloga, 277 F. Supp. 864, 869 (N.D.Ill.1967), "(i)t is elementary that in order to establish a violation of the Fourteenth Amendment, there must be 'state action' which results in deprivation of a right, privilege or immunity protected by that Amendment." Rogers v. Provident Hospital, 241 F.Supp. 633, 636–637 (N.D.Ill.1965).

The state action requirement has, of course, been applied to numerous situations besides those involving official governmental entities. In each case, the private or non-governmental conduct has related to an area of vital public concern. One group of such cases involves private ownership and control of the physical premises on which people live or work. Thus, in Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) the Supreme Court held that a company town's refusal to permit the use of its streets for the distribution of religious literature violated the Fourteenth Amendment. The Court reasoned:

"Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it. * * *

"Whether a corporation or a municipality owns or possesses the town the public in either case has an identical interest in the functioning of the community in such manner that the channels of communication remain free." Id. at 506–507, 66 S.Ct. at 279.

The Marsh rationale was recently adopted in Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603

(1968), where the Court held that pickets' constitutional rights were violated when a shopping center and supermarket refused to permit picketing on their premises.

Other cases relied on by plaintiff and holding private conduct to be state action for certain constitutional purposes do not concern ownership of property or territorial control. See, e. g., Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (refusal of private restaurant located in a publically owned and operated automobile parking facility to serve a person solely because of his color violated the Equal Protection Clause of the Fourteenth Amendment); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (refusal of private political association to permit otherwise qualified Negroes to participate in private elections deprived petitioners effective participation in public election contrary to Fifteenth Amendment); Marjorie Webster Junior College, Inc., v. Middle States Association of Colleges and Secondary Schools, Inc., 302 F.Supp. 459 (D.D.C. July 23, 1969) (refusal of regional educational association to consider plaintiff for accreditation and membership solely because it was not a non-profit organization violated the Fourteenth Amendment).

Of course, none of these cases, on their face, factually resembles the instant action. Plainly, not one case concerns privately owned newspapers. Only two of the cases, *Marsh* and *Logan Valley*, directly involves the First Amendment freedoms at issue here.

■ Moreover, the differences between the defendants in this case and those in the cases cited by plaintiff go far beyond the obvious fact that defendants here are newspapers while the defendants in the other cases were different kinds of private concerns. First and foremost, the press is treated with special Constitutional regard. No other private industry or organization has been afforded any protection similar to that granted to the press under the First Amendment. The only other industry that was ever treated specially in the Constitution was the liquor industry, but the Eighteenth Amendment was short lived, being repealed within fourteen years by the Twenty-First Amendment. Consequently, any attempted regulation of the press' freedom stands in a different Constitutional light and must be viewed differently than regulations of other forms of private commerce and association.

■ Second, the relation of the press to the government is functionally distinguishable from that relationship which exists between other private entities and the state. For instance, the restaurant in the *Burton* case was the lessee of an agency created pursuant to Delaware law. While it was considered an " 'impossible task' " "to fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause," state participation was apparent in the management of the property. Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860 (1961). Moreover, Delaware, through its agency, had "elected to place its power, property and prestige behind the admitted discrimination," and thereby became recognizable as a "joint participant in the challenged activity." *Id.* at 725, 81 S.Ct. 856, 862. In *Terry,* the Jaybird Democratic Association or Jaybird Party was the dominant political group in a Texas county for over sixty years. Winning candidates in the Jaybird primary invariably won in subsequent Democratic primaries and in the general election. Terry v. Adams, 345 U.S. 461, 463, 73 S.Ct. 809 (1953). Essentially, the Court found that as the Jaybird election was a critical part of the general elective process, state involvement in permitting an abuse of its electoral processes was obvious. *Id.* at 469, 73 S.Ct. 809. The District Court, in *Marjorie Webster,* held that the educational association's performance of its accreditation function was action in a

quasi-governmental capacity. The opinion noted that selection of educational institutions for federal funds "is frequently dependent upon the accredited status of the applicant," and found that the association's quasi-governmental capacity resulted "by virtue of its role in the distribution of Federal funds under the 'aid to education statutes.'" Marjorie Webster Junior College, Inc. v. Middle States Association of Colleges and Secondary Schools, Inc., 302 F.Supp. 459, 470 (D.D.C.1969). Essentially, the court agreed that the accrediting function practiced by defendant was inherently governmental, and that the association was exercising delegated powers of a governmental nature. Finally, the *Marsh* and *Logan Valley* decisions rested on the finding that the privately owned territory was indistinguishable, in terms of public access and use, from non-privately owned towns, business districts, and shopping centers. Amalgamated Food Employees Union Local v. Logan Plaza, 391 U.S. 308, 316–319, 88 S.Ct. 1601 (1969).

■ A similar interdependence of the government and the defendant newspapers is lacking. Quite simply, the business of newspapers is not inherently governmental. Even if we eliminated from our consideration the non-political and non-news aspects of today's major metropolitan papers, the reporting of the days events and related commentary is not a governmental function. Indeed, the opposite is true. While the government and its officials make news, they do not publish it. Significantly, while a company town may be likened to a municipal corporation and a private shopping center to a public business district, there is no state press, no American equivalent to Izvestia or Pravda.

Surely officials and agencies supply the press with information, but the function of reporting this information rests with the members of the media who may report as they wish or not at all. Then, too, public buildings often have special facilities for members of the press and statutes require publication of various items in the newspapers, e.g., Ill.Rev.Stat. Ch. 24, § 1–2–4 (1967). However, none of these facts compels a conclusion that the press and the government are significantly intertwined or that the role of the press is an inherently governmental one.

Rather than regarded as an extension of the state exercising delegated powers of a governmental nature, the press has long and consistently been recognized as an independent check on governmental power. "The right of free public discussion of the stewardship of public officials was * * *, in Madison's view, a fundamental principle of the American form of government." New York Times Co. v. Sullivan, 376 U.S. 254, 275, 84 S. Ct. 710, 723, 11 L.Ed.2d 686 (1964). So it is that the national policy favoring full and frank exercise of the press' freedom "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270, 84 S.Ct. at 721. See Chafee, Free Speech in the United States 19, 21–22, 29 (1954).

■ In sum, the function of the press from the days the Constitution was written to the present time has never been conceived as anything but a private enterprise, free and independent of government control and supervision. Rather than state power and participation pervading the operation of the press, the news media and the government have had a history of disassociation.

Not surprisingly, then, plaintiff's position that newspapers are quasi-public bodies has clearly been rejected by the judiciary.

"In the absence of any statutory provisions to the contrary, the law seems to be uniformly settled by the great weight of authority throughout the United States that the newspaper publishing business is a private enterprise and is neither a public utility nor affected with the public interest. The decisions appear to hold that even though a particular newspaper may

428

enjoy a virtual monopoly in the area of its publication, this fact is neither unusual nor of important significance. The courts have consistently held that in the absence of statutory regulation on the subject, a newspaper may publish or reject commercial advertising tendered to it as its judgment best dictates without incurring liability for advertisements rejected by it." Approved Personnel, Inc. v. Tribune Co., 177 So.2d 704, 706, 18 A.L.R.3d 1277 (Fla.App.1965).

Accord, Bloss v. Federated Publications, Inc., 5 Mich.App. 74, 145 N.W.2d 800, 804 (1966), aff'd 380 Mich. 485, 157 N. W.2d 241 (1968); J. J. Gordon, Inc. v. Worcester Telegram Publishing Co., 343 Mass. 142, 177 N.E.2d 586, 587–588 (1961); see generally Annot., Right of Publisher of Newspaper or Magazine in Absence of Contractual Obligation, to Refuse Publication of Advertisement, 18 A.L.R.3d 1286 (1965).

Nor do Red Lion Broadcasting Co. v. F. C. C., 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), or New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710 (1964), require a finding that a Constitutional right of access to the printed news media exists. Red Lion upheld the Federal Communications Commission's fairness doctrine imposed on radio and television broadcasters. The Supreme Court's opinion specifically rejected the broadcaster's argument that all communications media be treated equally under the First Amendment. 395 U.S. at 386, 89 S.Ct. 1794. Special restrictions on electronic broadcasters were justified on technological grounds which are obviously not applicable to newspapers. Id. at 375–377, 386–387, 89 S.Ct. at 1794. As then Judge Burger said:

"A broadcaster has much in common with a newspaper publisher, but he is not in the same category in terms of public obligations imposed by law. A broadcaster seeks and is granted the free and exclusive use of a limited and valuable part of the public domain; when he accepts that franchise it is burdened by enforceable public obligations. A newspaper can be operated at the whim or caprice of its owners; a broadcast station cannot." Office of Communication of United Church of Christ v. F. C. C., 123 U.S.App.D.C. 328, 359 F.2d 994, 1003 (D.C.Cir. 1966).

If a right of access existed with regard to newspapers, compliance with the rule would be considerably simpler than it is for broadcasters, for a newspaper is a relatively flexible and expandable commodity. The defect in plaintiff's action is that no such rule exists.

In New York Times, the Supreme Court held that a state court cannot award damages to a public official for defamatory falsehood relating to his official conduct unless plaintiff proves actual malice. In the course of its opinion, the Court recognized the importance of editorial or political as opposed to commercial advertisements. 376 U.S. at 265–266, 84 S.Ct. 710. It found, as we could find in the instant case, that "as an expression of grievance and protest on one of the major issues of our time, (the advertisement) would seem clearly to qualify for the constitutional protection." Id. at 271, 84 S.Ct. at 721. That protection does not mean that a newspaper can be forced to publish the ad. See Mid-West Electric Cooperative, Inc. v. West Texas Chamber of Commerce, 369 S.W.2d 842 (Tex.Civ.App.1963). It means, rather, that an expression may not be afforded different treatment by the state merely because it appears in the form of an advertisement and not, for instance, orally or on a picket sign or a handbill. 376 U.S. at 266, 84 S.Ct. 710. Consequently, political advertisements are constitutionally protected to no greater and no lesser extent than other forms of speech, and interference by state action with such expression is prohibited. The New York Times case decidedly does not stand for the proposition that those who can pay for political advertisements are constitutionally enti-

tled to have them published by private businesses.

We are not insensitive to the problems that have developed or may arise because of a lack of access to the market place of ideas. One of the tragedies of our age is that the failure to communicate effectively through conventional means has led some to attempt to persuade unconventionally and often violently. To the extent that the market mechanism is impaired, to the extent that discussion is not effectively full as well as legally free, we think that the public is done a disservice. Yet, if, in many respects, private censorship is no better than public censorship, the fact remains that the right to free speech was never intended to include the right to use the other fellow's presses, that the Constitution relates only to governmental and not private action.

Even those who chide the press' aversion to "novel" and "heretical" ideas recognize that "the daily press cannot be placed at the mercy of the collective vanity of the public." Barron, Access to the Press—A New First Amendment Right, 80 Harv.L.Rev. 1629, 1646, 1677 (1967). In attempting to resolve this dilemma, access would be restricted to "representative groups" or at least not denied unless on "rational grounds." *Id.* at 1666, 1670, but see 1677. Under a doctrine of open access, the problems inherent in such line-drawing are obvious. Why limit space to representative groups? Do not non-representative groups or individuals need greater assistance? Are there two sides to every issue or three or an indefinite number? Why limit access to the issue-oriented and not to the amateur sports writer or cartoonist? Most important, why limit access to those who can pay, for surely the poor are just as entitled to comment? The mere raising of these questions indicates why such extensive freedom is given to the press. There is scant, if any, middle ground between minor meddling and full abridgment. "(L)iberty of the press is in peril as soon as the government tries to compel what is to go into a newspaper." 2 Chafee, Government and Mass Communications 633 (1947) (See generally at 624–650). Thus even though some abuse was considered inevitable, the alternative cure was thought by Madison to be worse than the disease, Near v. Minnesota ex rel. Olson, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), and newspapers were and are left free to be impartial or biased, foolish or wise.

If, in fact, concentrations of private media power are stultifying, the appropriate approach to secure a right of access would be by "experimental, innovative legislation" or Constitutional amendments. Barron, *supra*, at 1670, 1676. However, this court does not sit as a creative legislative body, nor do we accept the admittedly "rather rabid conception of 'state action,'" *Id.* at 1669, that would compel private newspapers to print political advertisements.

With respect to Count I, the absence of state action relieves the court of civil rights jurisdiction and no other claim is stated upon which relief might be granted. Defendants' motions for summary judgment are granted. Plaintiff's motion for injunctive relief is denied. The cause is dismissed.