McCORMICK PIANO & ORGAN CO., INC., Appellant (Defendant Below),

v.

Dennis GEIGER and Janice Geiger, Appellees (Plaintiffs Below),

Jeane Bosselmann, Appellee (Defendant Below),

Glen McCormick, Appellee (Defendant Below).

No. 3-278A34.

Court of Appeals of Indiana, Third District.

Nov. 26, 1980.

W. Michael Horton, Charles J. Weinraub, Higgins, Swift & Weinraub, Fort Wayne, for appellant.

Edward E. Beck, Fort Wayne, for appellees Dennis Geiger and Janice Geiger.

HOFFMAN, Judge.

On April 1, 1976 plaintiffs–appellees Dennis and Janice Geiger brought an action against Jeane Bosselmann, Glen McCormick and McCormick Piano & Organ Co., Inc. charging that said defendants were liable for damages suffered by plaintiffs on the grounds of fraudulent misrepresentations, deceptive advertising, false imprisonment, assault and battery and slander. Subsequently, Glen McCormick and McCormick Piano filed counterclaims alleging that plaintiffs were guilty of libel. On January 18, 1977 the trial court granted McCormick Piano's motion for summary judgment on the false imprisonment count but denied it as to all other counts. From August 18–19, 1977 the cause was tried before a six–man jury. After the plaintiffs had presented their case–in–chief, defendants moved for judgment on the evidence. The trial court granted the motion on the slander count and also dismissed Glen McCormick as a defendant in the action. The jury returned general verdicts against Bosselmann and McCormick Piano in the sums of $4,000 and $10,000 respectively. It also found against McCormick and McCormick Piano on their counterclaims. Only McCormick Piano appeals from the judgment entered.

The issues presented for review include:

(1) Was there sufficient evidence that defendant violated IC 1971, 24–5–0.5–1 *et seq.* (Burns Code Ed.)?

(2) Did plaintiffs comply with the notice requirements of IC 1971, 24–5–0.5–5?

(3) Was Bosselmann an agent of defendant?

(4) Was there sufficient evidence that defendant violated IC 1971, 35–17–5–10 (Burns Code Ed.)?

(5) Is IC 1971, 35–17–5–12(7) constitutional?

(6) Did plaintiffs suffer any damages as a result of defendant's conduct?

(7) Did defendant breach any contract with plaintiffs? and

(8) Did the trial court err in denying defendant's motions for summary judgment on the slander and breach of contract counts?

Viewing the evidence in a light most favorable to the judgment discloses that on February 16, 1976 defendant circulated an advertisement in the Fort Wayne News–Sentinel announcing a special sale price of $699 on Kimball Whitney Spinet pianos. Along with other information about the sale the advertisement contained a drawing of a piano (hereinafter referred to as the composite piano) which was spread over half the layout. Although a picture of a Kimball Whitney Spinet piano was available for the advertisement, the drawing actually used was a composite of several more expensive models and bore a striking resemblance to a Crest piano which sold for $1,500. In fact McCormick, the company vice–president, acknowledged that the average person would not detect the six discrepancies between the composite and the Crest model.

On February 17 plaintiffs appeared at the Glenbrook North showroom and spoke with Bosselmann who was one of defendant's salesmen. They expressed an interest in purchasing a piano and remarked that the advertisement in question had caught their attention because the drawing matched the style of their furniture. During this conversation plaintiffs noticed a piano on display which looked similar to the composite piano. When asked whether this was the piano on sale Bosselmann replied that it

was not, explaining that the display piano was a Crest. But Bosselmann did offer to call McCormick in the morning to find out if the composite piano could be obtained.

On February 18 Bosselmann notified plaintiffs she was holding a piano for them at the company warehouse and arrangements were made to meet there in the evening. When plaintiffs saw the piano Bosselmann had selected, they stated that it was not the same as the one depicted in the drawing. Again they noted the resemblance between the Crest and the composite piano. Having failed to find the composite piano at the warehouse, plaintiffs were assured by Bosselmann that McCormick would definitely order one at the sale price.

On February 19 Bosselmann advised plaintiffs that she was unable to order the composite piano from the factory. Mrs. Geiger returned to the store in order to pursue the matter further. When queried by Mrs. Geiger as to whether the composite piano had ever been on sale, Bosselmann retorted that it was and that she had sold three or four of them the day before. Furthermore, she admitted that the Crest and the composite were the same piano. Mrs. Geiger then asked Bosselmann for the names of customers who had purchased composite pianos.

At this point Bosselmann became hysterical and exclaimed that she would not sell a piano to Mrs. Geiger if she were the last person on earth and that she was sick of looking at Mrs. Geiger's face. Due to her nervous condition Bosselmann was unable to use the telephone so she decided to leave the store unattended. In doing so she grabbed Mrs. Geiger by the arm and shook her momentarily. Subsequent efforts at rectifying matters between all parties concerned were unsuccessful and this action ensued.

Initially defendant insists there was insufficient evidence to establish that it violated IC 1971, 24–5–0.5–1 et seq., the Indiana Deceptive Consumer Sales Act. The act prohibits merchants from engaging in certain conduct which is considered per se as ·deceptive. IC 1971, 24–5–0.5–3(a) sets forth a series of proscribed practices and provides in relevant part as follows:

"The act of a supplier in representing, orally or in writing, as to the subject of a consumer transaction furnished by such supplier, any of the following is a deceptive act:

\* \* \* \* \* \*

(2) that such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and, if the supplier knows or should reasonably know that it is not."

Irrespective of the foregoing an act will not be deemed deceptive if the supplier shows by a preponderance of the evidence that the act resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid the error. IC 1971, 24–5–0.5–3(c).

Defendant levels an array of arguments in support of its insufficiency claim, the first of which is that no "consumer transaction" occurred. As used herein the term "consumer transaction" refers to

"... a sale, lease, assignment, award by chance, or other disposition of an item of goods, a service, or an intangible, except securities and policies or contracts of insurance issued by corporations authorized to transact an insurance business under the laws of the state of Indiana, with or without an extension of credit, to an individual for purposes that are primarily personal, family or household, or a solicitation to supply any of these things."
(Emphasis added)
IC 1971, 24–5–0.5–2.

Focusing on the underlined portion of the statute, defendant suggests that a newspaper advertisement is not an offer for sale but only a solicitation for offers and hence the act is inapposite citing *Chicago Joint Bd. Amal. Cloth. Wkrs. v. Chicago Tribune Co.* (N.D.Ill.1969) 307 F.Supp. 422. This position is not well taken. *Chicago Tribune* merely held that under general contract theory there is a presumption that general advertising aimed at the public is not an offer to enter a contract. But the fact that

an advertisement is not an offer for sale for purposes of contract law is not germane under IC 1971, 24–5–0.5–1 *et seq.* because the act only requires that the advertisement be a solicitation to supply.

In *Weaver v. J. C. Penney Co., Inc.* (1977), 53 Ohio App.2d 165, 372 N.E.2d 633, a consumer brought an action to recover damages for an alleged deceptive act by a retailer which refused to issue a raincheck to the consumer or to place an order for the advertised goods at the advertised price after the supply was exhausted. There the deceptive sales statute under consideration defined consumer transaction in terms nearly identical to our own. In the course of holding that the newspaper advertisement in question constituted a deceptive act, the court opined:

"First, it would appear that despite the fact that no sale ever took place, a 'consumer transaction' within the statutory scheme occurred. Under R.D. 1345.01(A), a ' "consumer transaction" means a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, franchise, or an intangible . . . to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things.' (Original emphasis)

"From this language, it is apparent that under the Consumer Sales Practices Act it is not necessary that a sale actually take place before a supplier may be held liable to a consumer for deceptive acts. A solicitation to sell goods or services intended primarily for personal, family, or household use, may be sufficient to give rise to liability even in the absence of an actual sale if a deceptive act is committed in connection with that solicitation.

"In this case, it is clear that appellee solicited the sale of the advertised waffle bakers. Obviously, those items are intended for personal, family, or household use. Accordingly, we conclude that the solicitation constituted a 'consumer transaction' within the meaning of the Act." 372 N.E.2d at 635–636.

This statement of the law seems particularly appropriate here and is therefore expressly adopted. IC 1971, 24–5–0.5–3(b) also lends support for the view espoused in *Weaver.* It provides in part that "*[a]ny representations . . . in advertising . . . which would constitute a deceptive act* under section 3(a) [subsection (a) of this section] shall be the deceptive act both of the supplier who places such representation thereon or therein, or who authored such materials and such other suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false." [Emphasis supplied] Certainly this provision contemplates that advertisements like the one at bar could serve as the basis for a deceptive act. Otherwise the aforementioned language is largely meaningless.

Consistent with what has been stated herein it appears that the use of "bait–and–switch" advertising as a lure to sell other non–advertised products is exactly the kind of trade practice which the act is designed to prohibit. To hold differently would emasculate the dual policies of protecting consumers from suppliers who commit deceptive sales acts and of encouraging the development of fair consumer sales practices. IC 1971, 24–5–0.5–1.

Defendant also maintains that even if the advertisement was a solicitation for sale still no deceptive act was committed in connection with it. In an effort to demonstrate this, defendant points to the fact that the piano labeled in the advertisement, Kimball Whitney · Spinet, actually was on sale for $699. Additionally, it emphasizes the uncontroverted nature of McCormick's testimony that the composite drawing of the piano depicted in the newspaper had been included in the advertisement through inadvertence to underscore its assertion that any confusion surrounding the sale resulted from a bona fide error. Plaintiffs counter by maintaining that there was sufficient evidence from which the jury could conclude that defendant violated IC 1971, 24–5–0.5–3(a)(2) which prohibits a supplier

from representing that "such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and, if the supplier knows or should reasonably know that it is not."

 To be actionable under this clause the representation must be referential; that is, it must compare the goods to an objective and independent standard. *Denson v. Ron Tonkin Gran Turismo, Inc.* (1977) 279 Or. 85, 566 P.2d 1177. In the instant case the jury could infer that the composite drawing was the objective and independent standard with which the Kimball Whitney Spinet was being compared. McCormick frankly admitted that the composite piano looked like a Crest piano which retailed at nearly $1,500 and that the average person would not detect the six discrepancies between the drawing and the Crest model. Moreover, plaintiffs, who were interested in the piano depicted in the drawing because it matched the style of their furniture, were unaware of the distinctions between a Crest and Kimball Whitney Spinet. These facts adequately underpin an inference that defendant committed a deceptive act.

In response to the contention that defendant sustained its burden of proving that the advertisement resulted from a bona fide error, there was evidence that a month prior to this sale the defendant had run an advertisement for Kimball Whitney Spinet pianos which too had an inaccurate drawing. From this the jury was justified in rejecting defendant's rendition of the manner in which the advertisement was placed.

 Closely related to the previous assignments of error is the proposition that since no piano was "furnished" to the plaintiffs IC 1971, 24–5–0.5–3(a) cannot be relied upon to establish a claim for damages. This assertion misses the mark. The plain and ordinary meaning of the word "furnish" is to supply or provide. *Boykin v. Commissioner of Internal Revenue* (8th Cir., 1958) 260 F.2d 249; *Williams v. Pipe Trades Industry Program of Arizona* (1966) 100 Ariz. 14, 409 P.2d 720; *Dillingham v. American Security Life Insurance Co.* (1964) Tex.

Civ.App., 384 S.W.2d 920. Insofar as defendant supplied or provided an advertisement the element of "furnished" was met. Stated differently, it is not the subject (piano) but rather the consumer transaction (advertisement) which must be supplied or provided by the defendant. To say that a sale must actually take place would circumvent the intent of the Legislature which took great pains to include acts of deceptive solicitation as prohibited conduct.

██ Next it is alleged that plaintiffs failed to prove defendant was a "supplier," a term which encompasses "a seller, lessor, assignor, or other person who regularly engages in or solicits consumer transactions, including a manufacturer, wholesaler or retailer, whether or not he deals directly with the consumer." This allegation may be summarily disposed of. The testimony of McCormick reflected that the company had been engaged in the retail piano business for twenty–six years. Furthermore, there is the fact that defendant had placed advertisements in the newspapers to promote the sale of its pianos on more than one occasion. Undeniably defendant fits squarely within the definition of a "person who regularly engages in or solicits consumer transaction."

Defendant also challenges the adequacy of plaintiffs' compliance with the notice requirements of the act. The crucial parts of IC 1971, 24–5–0.5–5 read as follows:

"No action may be brought under this chapter [34–5–0.5–1–24–5–0.5–6] ... unless (1) the deceptive act is incurable or (2) the consumer bringing the action shall have given notice in writing to the supplier ... which notice shall state fully the nature of the alleged deceptive act and the actual damage suffered therefrom, and unless such deceptive act shall have become an uncured deceptive act."

This statute must be read in conjunction with clauses (6) and (7) of IC 1971, 24–5–0.-5–2 which state that:

"(6) The term 'uncured deceptive act' means a deceptive act (1) with respect to which a consumer who has been damaged

by such act has given notice to the supplier under section 5(a) [24–5–0.5–5(a)] of this chapter and (2) either (i) no offer to cure has been made to such consumer within thirty [30] days after such notice of (ii) the act has not been cured as to such consumer within a reasonable time after his acceptance of the offer to cure. "(7) The term 'incurable deceptive act' means a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead."

The import of these provisions is clear. Once the consumer gives notice to the supplier within the applicable period of an alleged deceptive act stating completely the nature of the act and the actual damage suffered therefrom, then the supplier has thirty days in which to make adjustments or modifications. After this thirty–day interval has expired the consumer may bring suit for "an uncured deceptive act" if he still feels aggrieved by the supplier's actions. But if the consumer fails to comply with the notice procedures then his suit can only be for "an incurable deceptive act."

■ The distinction drawn between these terms of legal art is of significance. Where a consumer has given the prescribed notice his statutory cause of action is predicated on an "uncured deceptive act" and he need only prove commission of an act or practice which has been defined as deceptive by IC 1971, 24–5–0.5–3(a) in order to establish a prima facie case. But where he has not satisfied the notice prerequisites the consumer must prove not only that a deceptive act was committed but also that it was done as part of a scheme, artifice or device with the intent to defraud or mislead. This is what the statute means by an "incurable deceptive act."

The reason for the distinction is obvious. The notice provided by the demand letter gives the supplier an opportunity to review the facts and the law involved so that he can determine if the requested relief should be granted or denied. The notice requirement commences the running of certain time constraints upon the supplier within which to comply with the corrective provisions of the statute. The clear intent of the act is to provide and facilitate pre–complaint settlements of consumer actions wherever possible and to establish a limited period during which such settlement may be accomplished. This clear purpose may be effectuated only by a literal application of the notice provisions. *Outboard Marine Corp. v. Superior Ct., Cty. of Sacramento* (1975) 52 Cal.App.3d 30, 124 Cal.Rptr. 852; *Slaney v. Westwood Auto, Inc.* (1975) 336 Mass. 668, 322 N.E.2d 768. Thus, whenever a consumer neglects to avail himself of the notice provisions or else improperly invokes them, an additional element of proof is imposed on him.

■ In the present case, on March 5, 1976 plaintiffs sent a letter to McCormick regarding the circumstances surrounding the advertisement. Their complaint was filed April 1, 1976. It is apparent then that plaintiffs failed to give defendant the requisite thirty days to cure. Moreover, the letter itself is deficient in that it does not state the actual damage incurred by plaintiffs. For these reasons plaintiffs were obliged to prove that defendant committed an "incurable deceptive act" in order to recover under the Deceptive Consumer Sales statute.

■ Since the statutory definition of "incurable deceptive act" couples the words "defraud" and "mislead" by the disjunctive "or," it is manifest that such an act may be committed where the facts evince an intent to mislead. That is misleading which "tends to lead astray or into error; to guide wrongly." *People v. Wahl* (1940) 39 Cal. App.2d 771, 100 P.2d 550; *People v. Witzerman* (1972) 29 Cal.App.3d 169, 105 Cal.Rptr. 294.

The evidence here discloses that when plaintiffs first entered the music store they noticed a piano on display which matched the composite drawing seen in the newspaper. Upon inquiring as to whether this was the piano on sale they were informed by Bosselmann that it was not in that the display piano was a Crest. However, Bosselmann did tell them that she would call

McCormick in the morning to find out if the composite piano could be obtained. She also represented that she had sold several of the composite pianos to schools and churches due to its ornate styling. The Kimball Whitney Spinet, by contrast, was a rather plain model.

On the following day Bosselmann notified plaintiffs that a composite piano was available and that she would hold it for them. That evening the parties met at the company warehouse. As had happened on the previous day plaintiffs saw a piano that resembled the composite drawing but were again advised by Bosselmann that the Crest model was not on sale. A search through the warehouse for other pianos resembling the composite drawing proved unavailing. Bosselmann then told them that McCormick would definitely have to order one at the sale price. However, no such piano was ever ordered. Not only did Bosselmann tell Mrs. Geiger that she had sold three or four of the composite pianos but she also later admitted that the Crest and the composite were the same piano. In addition to these facts it must be kept in mind that a picture of a Kimball Whitney Spinet piano was available and that defendant had placed an incorrect advertisement in the newspaper on a prior occasion. This evidence was sufficient to bring defendant's conduct under the ban of the statute.

Of course this conclusion to a large extent presupposes that Bosselmann was an agent of the defendant. Generally speaking, whether a person is an agent of another is a question of fact. *Musgrave v. Madonna* (1976), 168 Ind.App. 145, 341 N.E.2d 789. To fortify its assertion that no agency relationship existed, defendant notes these factors: Bosselmann was paid strictly on a commission basis; no income tax or social security deductions were withheld from her earnings; she was not provided with health insurance coverage or pension benefits; she alone determined the hours that she would work; and finally, she was not required to sell the store's merchandise at a price dictated by the defendant.

Although her compensation was limited to commissions on sales, this fact does not lead unerringly to an inference that no agency relationship existed. On the contrary it tends to prove agency. *See, Central Trust Co. v. Duncan* (1929), 92 Ind.App. 224, 168 N.E. 506 where one of the facts relied upon to sustain a finding of agency was that the compensation of the alleged agent consisted only of the amount received by him in excess of the base price quoted by the company. *Cf.: Donner v. Morse Auto Rentals, Inc.* (1963) Fla., 147 So.2d 577 (factual question as to whether doormen who received commissions from automobile rental agency were its agents held to preclude summary judgment).

Nor is the fact that Bosselmann was not bound to sell pianos at a price dictated by defendant decisive. In reality she was constrained to operate within a price structure contained in a base card supplied by defendant which assigned a high and a low price for each piece of merchandise. As long as Bosselmann remained within these parameters she was free to determine the actual retail price. This too supports an inference of agency. As noted in *Willcox & Gibbs Co. v. Ewing* (1891) 141 U.S. 627, at 636–637, 12 S.Ct. 94, 97, 35 L.Ed. 882:

> "It is true that the machines he undertook to sell were to be purchased by him from the company at a large discount. *But he could not sell them by retail below the regular retail prices.* This arrangement was the mode adopted to protect the company's interests, and to secure the plaintiff such compensation for his services as would induce him to devote his time, attention and abilities to the company's interests. *He was still a mere agent to sell such machines as might be delivered to him under the contract.*" (Emphasis added)

Also available for the jury's consideration was evidence that Bosselmann received her sales training from defendant and that it provided a store where she could sell the merchandise. It was within the province of the jury to weigh the evidence and the

conflicting inferences to be drawn therefrom. The determination was not contrary to law.

It is also submitted there was insufficient evidence that defendant violated IC 1971, 35–17–5–12(7) which provides as follows:

"Any person who is injured or damaged by an unlawful act as defined in this chapter shall have a civil action and if he recovers any money damages, shall recover threefold the amount of actual damages established therein as sustained by him, together with the costs of the action, including a reasonable attorney's fee."

The statutory provision defining the pertinent unlawful act can be found at IC 1971, 35–17–5–10 where it states:

"A person commits a crime when: . . . (3) he disseminates or causes to be disseminated an advertisement containing a knowingly false, misleading or deceptive statement in any form or through any medium, to the public, including door to door distribution, for the purpose of promoting the purchase or sale of property or services of any kind, or the acceptance of employment.

In determining whether any advertisement is untrue, deceptive or misleading, there shall be considered, among other things, not only representations contained or suggested in the advertisement, by whatever means, including device or sound, but also there shall be considered the extent to which the advertisement fails to reveal material facts in the light of such representations." [1]

Defendant first advances the argument that the advertisement was not "knowingly misleading." To reiterate what has been said before the advertisement was misleading and knowledge by defendant of its deceptive nature can be inferred from evidence of the prior incorrect advertisement. ▆▆▆ Additionally defendant contends that absent proof of a conviction for disseminating a misleading advertisement no "unlawful act" was committed as that term

is used in IC 1971, 35–17–5–12(7). The term "unlawful act" does not necessarily mean a criminal act; it connotes any actionable wrong. *Columbia Real Estate Title Ins. v. Caruso* (1978) 39 Md.App. 282, 384 A.2d 468; *Empire Fire and Mar. Ins. Co. v. First Nat. Bank of Ariz.* (1976) 26 Ariz.App. 157, 546 P.2d 1166.

" 'The act must be of such a character as to create an actionable wrong before the right of recovery against the defendant exists, and to create an actionable wrong the legal rights of the plaintiff must in some way be invaded. There must be a violation of a legal right committed knowingly to create a cause of action.' " *Columbia Real Estate Title Ins. Co. v. Caruso, supra*, 384 A.2d at 472.

If the Legislature had intended for the civil penalty provisions to be operable only on proof that one of the offenses enumerated in Chapter 5 of IC 1971, 35–17 resulted in a conviction, it would have drafted the statute to include the word "conviction" which has a well–recognized meaning. The courts cannot add something to a statute that the Legislature has purposely omitted. *Town of Schererville v. Vavrus* (1979), Ind.App., 389 N.E.2d 346.

▆▆▆ Defendant also assails the constitutionality of IC 1971, 35–17–5–12(7) charging that to allow prevailing plaintiffs to recover attorney fees but not defendants, who successfully defend such actions, contravenes the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and provisions of the Indiana Constitution mandating open access to the courts (Article 1, Section 12) and equal privileges for all citizens (Article 1, Section 23). A threshold question that must be addressed is whether defendant lacks standing to raise this issue. The standing rules under both the United States and Indiana Constitutions are stated in terms of requiring a party to demonstrate injury. *Lutheran Hospital, etc. v. Dept. of P. W., etc.* (1979), Ind.App., 397 N.E.2d 638. Inasmuch as the trial court refused to award attorney

---

1. IC 1971, 35–17–5–1–14 was repealed by Acts 1976, P.L. 148, § 24. For general law on decep-

tion see IC 1971, 35–43–5–1–5 (Burns 1979 Repl.).

fees, defendant lacks the requisite standing to raise the constitutional argument.

The next attack launched by defendant is that there was no evidence its statutory transgressions caused any injury to plaintiffs. Plaintiffs answer this contention by suggesting that the $10,000 award included punitive damages as well as damages for loss of consortium and emotional distress. They also note evidence of expenses for long–distance telephone calls, photocopying, postage and medication, plus lost wages and loss of bargain on the piano.

IC 1971, 24–5–0.5–4(a) circumscribes the basis of recovery by injured consumers to damages "actually suffered."[2] On its face this language appears to rule out punitive damages since the phrase actual damages includes all except that category called punitive, vindicative or exemplary. *Skipper v. South Central Bell Telephone Co.* (1976) Ala., 334 So.2d 863; *Ellingson v. Spokane Mortg. Co.* (1978) 19 Wash.App. 48, 573 P.2d 389.

To obviate this conclusion plaintiffs invite attention to the general rule of law that punitive damages are permissible where elements of malice, fraud or oppressive conduct mingle in the controversy. Since the verdict can be upheld on the theory of common–law fraud or deceit, they reason that punitive damages were properly awarded.

Indiana has adopted the view that compensatory damages are a prerequisite for any award of punitive damages. *Newton v. Yates* (1976), Ind.App., 353 N.E.2d 485. But, as will become evident, there was insufficient proof that plaintiffs suffered any damage because of defendant's conduct. Therefore, the lack of compensable damages operates as a bar to recovery of punitive damages.

In no way can damages for emotional distress be recovered either. It is the general rule that a person cannot recover damages for emotional distress unless he sustains a physical injury. *Indiana Motorcycle Ass'n v. Hudson* (1980), Ind.App., 399 N.E.2d 775. *See also, Dennis Weaver Chevrolet, Inc. v. Chadwick* (1978) Tex.Civ.App., 575 S.W.2d 619 where it was held that damages for emotional distress may not be recovered under the Deceptive Trade Practices Act in the absence of a physical injury. Insofar as plaintiffs have made no showing of any physical injury caused by defendant, emotional distress could not be an element of damages in support of the verdict.[3]

Likewise Dennis was not entitled to recover damages for loss of consortium. The only evidence pertaining to this matter was his testimony that as a result of the incident with Bosselmann there was an added tension in their marital relationship. This is factually insufficient to support such an award.

Turning now to the other damages alleged to have been caused by defendant, the record discloses that sometime after the incidents at the store and warehouse had transpired Janice called her sister, Constance Cumbey, who was an attorney in Michigan. Apparently these calls, which totaled nearly $20, were made for the purpose of seeking legal advice. Plaintiffs also spent $10 on postage and photocopying in order to send letters explaining their version of the events leading up to this suit to the Better Business Bureau, the Allen County Prosecutor, the Attorney General of

2. IC 1971, 35 17-5-12(7) limits recovery to three times the actual damages sustained by the consumer.

3. While Indiana has recognized one exception to this general rule it is inapposite here. The exception states that compensatory damages for emotional distress unaccompanied by physical injury may be awarded in certain tort actions involving invasion of legal rights which by its very nature is likely to provoke emotional disturbances, e. g., assault. But plaintiffs have already recovered a $4,000 judgment against Bosselmann. The only way that the verdicts against Bosselmann had defendant can be reconciled is for the jury to have found that Bosselmann committed an assault and battery outside the scope of her employment. To hold that the exception is applicable under these circumstances would be contrary to the general policy of the law that there should only be one satisfaction of a wrong. *Neveroski v. Blair* (1976), 141 N.J.Super. 365, 358 A.2d 473.

Indiana, Constance Cumbey, Edwin Rousseau who was the resident manager of the Glenbrook Shopping Center, the Saal Advertising Agency, the Fort Wayne newspapers and the Kimball Piano and Organ Company in Jasper, Indiana. Dennis, who was assigned the third shift at work, lost several days of wages due to appointments with his attorney. Janice spent $40 for a librium prescription to relieve her of the tension ostensibly caused by the conduct of defendant and Bosselmann. Finally, a claim is made for $501 which sum represents the difference between the price of the Crest as offered to plaintiffs by McCormick ($1,200) and the sale price stated in the ad ($699).

■■■ Concerning the incidental expenditures it is a fundamental rule of law that where a party seeks to recover expenses incurred as a part of his damages there must be some proof that they were necessary. See: Gibson v. Morton (1925), 88 Ind.App. 685, 148 N.E. 430; Woo v. Great Southwestern Acceptance Corp. (1978) Tex.Civ.App., 565 S.W.2d 290. There was absolutely no evidence to indicate that plaintiffs' expenses for telephone calls, photocopying or postage were necessary. Consequently, they were not recoverable.

■■ With respect to the expenditure for the nerve pills, since damages for emotional distress were not compensable a fortiori there can be no recovery for treatment of the disorder either.

■■■ Nor are the alleged damages for time lost from work allowable. A similar claim was raised and rejected in Phillips v. Latham (1975) Tex.Civ.App., 523 S.W.2d 19 and its rationale applies with equal force here.

"The only remaining item of actual damages submitted by the trial court is 'loss of earnings in the past.' As we read the record, the only time lost from work by either of the plaintiffs, except that resulting from illnesses now shown to have been caused by defendants' acts, was time lost because of the pendency of the lawsuit, such as that required for depositions and attendance at the two trials in this case. This loss is an expense of litigation. We know of no authority supporting recovery of actual damages for such a loss, and plaintiffs have cited none."

523 S.W.2d at 27.

Moving to a discussion of plaintiffs' purported loss of bargain it is clear that to award such damages under the circumstances existing here would be contrary to well-recognized principles governing the law of remedies. The term "actual damages," while excluding those characterized as punitive, contemplates common–law damages, i. e., the difference in value between that which the plaintiff parted with and that which he received. United Postage Corp. v. Kammeyer (1979) Tex.Civ. App., 581 S.W.2d 716. The evidence in the instant case indisputably shows that plaintiffs did not purchase any piano nor did they part with anything of value. For this reason they cannot recover for any asserted loss of bargain. See, Ceshker v. Bankers Commercial Life Ins. Co. (1977) Tex.Civ. App., 558 S.W.2d 102 where it was held that under the Deceptive Trade Practices Act a consumer may not bring an action based on an alleged deceptive advertisement for insurance which he never bought.

■■■ The next question for review is whether defendant breached any contract with plaintiffs. It was borne out at trial that to complete a sale a prospective purchaser must either (1) sign a sales receipt; (2) sign a contract if financing is involved; or (3) tender a down payment. There was no proof that plaintiffs met any of these prerequisites. But even assuming that a contract was formed it was unenforceable because it was not reduced to writing. IC 1971, 26–1–2–201 (Burns Code Ed.).[4]

4. IC 1971, 26–1–2–201(1) provides:
"Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforce-

Lastly, defendant urges that the trial court erred in denying its motions for summary judgment on the slander and breach of contract counts. The record reveals that after plaintiffs presented their case–in–chief defendant moved for judgment on the evidence (Ind. Rules of Procedure, Trial Rule 50) as to the slander count and said motion was granted. In regards to the breach of contract theory the trial court left that issue for the jury's consideration even though, as defendant has noted, there was insufficient evidence that an enforceable contract existed between the parties. With this procedural posture in mind defendant contends it was error to submit there issues for trial.

> "It is well established in Indiana that the appellant has the burden of proving that error occurred at trial. But that alone is insufficient to justify reversal. The appellant must also demonstrate that the shown error was prejudicial and harmed her case. *Traylor Bros., Inc. v. Alford* (1967), 142 Ind.App. 294, 230 N.E.2d 336; *Wells v. Gibson Coal Co.* (1976), Ind.App., 352 N.E.2d 838."

*Richardson v. Brown* (1977), Ind.App., 362 N.E.2d 197, at 199.

Assuming without deciding that error was committed defendant has made no showing of prejudice aside from a bald assertion that judicial economy would have been served if the trial court had granted the motions for summary judgment. Accordingly, this assigned error is without merit.

Remanded with instructions to proceed in a manner not inconsistent with this opinion.

GARRARD, P. J., concurs.

STATON, J., dissents with opinion.

STATON, Judge, dissenting.

I dissent, since I believe that punitive damages should be awarded. Assuming *arguendo* that the emotional stress–physical injury rationale of the majority is valid, the contractual relationship and the oppressive

conduct of McCormick Piano justifies the jury's application of punitive damages. Sullivan, Timothy J., *Punitive Damages in the Law of Contracts*, (1977) 61 Minn.L. 207; *Hibschman Pontiac, Inc. v. James B. Batchelor, Gen. Motors Corp.*, (1977), 266 Ind. 310, 362 N.E.2d 845.

---

ment is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed

upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing."